IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,960

STATE OF KANSAS,
*Appellee*,

v.

MARK KENDALL,
*Appellant.*

SYLLABUS BY THE COURT

1.

In order to establish that a perpetrator committed an "act of communication" under Kansas' stalking statute, K.S.A. 2010 Supp. 21-3438, the State must show that the perpetrator sent or transmitted a communication to the victim and the victim received the communication.

2.

Under the specific facts of this case, the defendant violated the stalking statute by calling the victim's cell phone in violation of a protective order and, in turn, the victim seeing on her phone's caller ID that the defendant was calling her cell phone. A reasonable factfinder could infer that the defendant, by calling the victim's phone, was communicating to the victim—just as he had previously promised her—that he would contact her no matter what, regardless of the protective order put in place or the fact that he was in prison, and that this message was received by the victim.

1

3.

Unless specified in the statute defining the crime charged, the location of where the crime was committed is generally not an element of the crime; however, venue is a necessary jurisdictional fact that must be proven along with the elements of the crime.

4.

K.S.A. 22-2602 authorizes the State to prosecute a crime in the county where the crime was committed. But, when two or more acts are requisite to the commission of the crime charged and such acts occur in different counties, K.S.A. 22-2603 authorizes the State to prosecute the crime in any county in which any of such acts occur.

5.

Unessential facts alleged in a complaint, information, or indictment constitute surplusage and may be disregarded by a court.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 16, 2013. Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed August 8, 2014. Judgment of the Court of Appeals affirming in part, reversing in part, and remanding to the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Stephen D. Maxwell*, senior assistant district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Following a bench trial, the Reno County District Court found Mark Kendall guilty of stalking and violating a protective order based on his July 7, 2010, acts

2

of placing telephone calls from the State prison in El Dorado, where he was an inmate, to his former wife, D.K. Notably, D.K. and Kendall never spoke over the telephone, but based on her phone's caller ID, D.K. knew that Kendall was calling her from the prison.

On appeal, a majority of the Court of Appeals panel agreed with Kendall that insufficient evidence was presented at trial showing that Kendall had committed an "act of communication" as proscribed by the stalking statute. As a result, the majority reversed Kendall's conviction for stalking and remanded the case to the district court with instructions that Kendall be convicted of attempted stalking and sentenced accordingly. *State v. Kendall*, No. 106,960, 2013 WL 4404174, at \*3-5 (Kan. App. 2013) (unpublished opinion).

With regard to Kendall's conviction for violating a protective order, the entire panel rejected Kendall's argument that the State was required to prove that he was in Reno County when he placed the telephone calls to D.K.'s cell phone—as alleged in the complaint. The panel also rejected Kendall's argument that the district court judge, despite finding him guilty of violating a protective order—a crime that prohibits knowing or intentional conduct—found that his conduct in violation of the order was reckless and, thus, the finding was contrary to the verdict. *Kendall*, 2013 WL 4404174, at \*5-7.

We granted the State's petition for review to determine whether a majority of the Court of Appeals erred in construing the phrase "act of communication" and whether the majority's construction of the phrase led it to erroneously conclude that the State presented insufficient evidence to convict Kendall of stalking. We also granted Kendall's cross-petition for review to determine whether the Court of Appeals erred in affirming Kendall's conviction for violating a protective order.

3

FACTS

A review of the record confirms the accuracy of the Court of Appeals' summation of the factual and procedural history of this case. Accordingly, that section of the opinion is quoted below.

"Kendall and D.K., his ex-wife, had a difficult marriage. D.K. obtained a protective order against Kendall. He was in prison for convictions arising from earlier incidents in which he stalked D.K., violated that protective order, and victimized her through computer crimes. [Prior to Kendall going to prison,] the two maintained a relationship of sorts because they have a young daughter A.K. For example, notwithstanding the protective order, they had an arrangement by which Kendall would call D.K.'s cell phone to speak with A.K. When D.K. saw Kendall's phone number come up on her phone, she would answer and simply hand the phone to A.K.

"Kendall pled guilty to the crimes for which he was imprisoned in El Dorado on February 1, 2010, and was sentenced on March 5, 2010. Between the plea and sentencing, D.K. obtained a new protective order against Kendall from the Reno County District Court. The protective order, among other restrictions, directed Kendall not to 'telephone, contact or otherwise communicate with' D.K. and not to 'contact' her 'either directly or indirectly.' The protective order went into effect on February 22, 2010, and remained valid for a year. A sergeant with the Hutchinson Police Department testified that he informed Kendall of the new protective order and the restrictions it imposed.

"When he arrived at the prison in El Dorado, Kendall listed D.K.'s cell phone number for inclusion on his approved call list. But he identified the number as his daughter's. At trial, Kendall testified he knew he was not supposed to call D.K. and listed the number that way so he could talk with A.K.

"The prison telephone system inmates use tracks the calls placed. Those records show Kendall dialed D.K.'s cell phone number once on May 23, four times on July 6, three times on July 7, and once on July 8, 2010. The records indicate each of the calls as a '[n]o [a]nswer' with a time of '0.00.' The Reno County District Attorney charged Kendall with one count of stalking, a felony under K.S.A. 2010 Supp. 21-3438(a)(3) and (b)(3), and one count of violating a protective order, a misdemeanor under K.S.A. 2010 Supp.

4

21-3843, for each date. At Kendall's preliminary hearing, the district court dismissed the charges based on the July 6 calls for lack of venue in Reno County. The State did not appeal that ruling. At the bench trial, the district court acquitted Kendall of the charges related to the calls on May 23 and July 8 without giving a detailed explanation. The district court mentioned D.K.'s failure to report those calls in her initial contact with law enforcement about Kendall's violation of the February 2010 protective order. The State may not appeal the acquittals. That leaves the two charges based on the July 7 calls Kendall placed.

"D.K.'s testimony about all of the calls, including those on July 7, is less than clear. Based on the identification information that appeared on her cell phone, she initially believed they were from a collection agency. D.K. said she tried to return one of the calls and found she was contacting ICS. She investigated the acronym on the internet and determined it to be 'Inmate Correctional Solution' and, coupled with the area code for the calls, deduced they came from the El Dorado prison and, thus, Kendall. The testimony suggests D.K. determined the calls came from Kendall on or before July 6. D.K. testified that meant Kendall 'was trying to prove to me he would still find me no matter what and he could get through the system no matter what.' D.K. said, as a result, she was 'scared' and 'sad' because 'it just pretty well showed he would find me and my daughter.' Nonetheless, D.K. said she answered at least one of the calls on July 7, but she did not testify that she heard anything or anyone when she did. Kendall testified that he heard a clicking sound when he placed the calls and nobody answered." *Kendall*, 2013 WL 4404174, at *1-2.

At the conclusion of the bench trial, the district court found Kendall guilty of both counts arising from July 7, 2010. The district court sentenced Kendall to a controlling 60-month prison sentence and ordered that the sentence be served consecutive to the prison sentence Kendall was already serving.

Pertinent to the issues now before us, Kendall argued before the Court of Appeals that the stalking statute, K.S.A. 2010 Supp. 21-3438(a)(3), required the State to show that he engaged in an "act of communication" resulting in a specific message being imparted

5

to D.K. Kendall contended that merely placing multiple calls to D.K.'s cell phone without ever speaking to her was insufficient to show that he engaged in an act of communication.

With regard to his conviction for violating a protective order, Kendall raised two issues arguing for reversal. First, he maintained that the district court judge, in explaining the verdict, found that he recklessly violated the protective order. Accordingly, he argued that the district court's finding of reckless conduct was essentially an acquittal because the applicable statute proscribed the act of "knowingly or intentionally" violating a protective order. See K.S.A. 2010 Supp. 21-3843(a)(1). Second, he claimed that because the State alleged in the complaint that he was in Reno County on July 7, 2010, when he violated the protective order, the State was required to prove this fact at trial. Kendall contended that because the evidence clearly showed that he was in prison in Butler County at the time of the crime, the State failed to prove all the elements necessary to convict him of violating a protective order as charged in the complaint.

A majority of the Court of Appeals agreed with Kendall that his conviction for stalking had to be reversed, construing the stalking statute as requiring the delivery or communication of a message to the victim (*i.e.*, D.K. answered her phone and Kendall spoke to her). Accordingly, the majority believed that Kendall's act of placing calls to D.K.'s cell phone without ever speaking to her was insufficient to show that he engaged in an "act of communication"—an essential element of stalking as charged by the State in this case. Furthermore, the majority rejected the notion that the inference D.K. drew from receiving phone calls from Kendall (*i.e.*, that Kendall would contact her despite being in prison) constituted evidence of Kendall imparting a message to her for purposes of the stalking statute. *Kendall*, 2013 WL 4404174, at *3-4.

6

As a result, the majority reversed Kendall's conviction for stalking. But, because the majority found that Kendall committed an overt act towards perpetration of stalking (*i.e.*, placing phone calls to D.K.'s cell phone), the majority remanded the case to the district court with instructions that Kendall be convicted of attempted stalking and sentenced accordingly. *Kendall*, 2013 WL 4404174, at *4-5. Judge Buser dissented, concluding that based on the evidence presented at trial, a reasonable factfinder could conclude that Kendall's act of placing a phone call to D.K.'s cell phone and D.K. realizing that Kendall was calling her constituted an act of communication under the stalking statute. *Kendall*, 2013 WL 4404174, at *8-9.

With regard to Kendall's conviction for violating a protective order, the entire panel agreed that sufficient evidence was presented at the bench trial to sustain the conviction. The panel concluded that Kendall was misconstruing the district court's findings at the conclusion of the bench trial. According to the panel, the district court did not find that Kendall's actions in dialing D.K.'s phone number were reckless and, thus, not intentional or knowing for purposes of K.S.A. 2010 Supp. 21-3843(a)(1). Instead, the panel construed the district court's statements as explaining that it was reckless or, stated another way, foolhardy for Kendall to rely on his prior arrangement with D.K. (*i.e.*, calling D.K.'s phone so Kendall could speak to their daughter) as a legal excuse or defense for his actions in calling D.K.'s cell phone in violation of the protective order. *Kendall*, 2013 WL 4404174, at *6-7.

Additionally, the panel found that it was insignificant that the complaint charging Kendall with violating a protective order alleged that Kendall was in Reno County at the time of the offense and that no evidence was presented at trial establishing this fact. The panel reasoned that because Kendall had failed to raise the issue before the district court, he had likely waived the issue. Regardless, the panel noted that Reno County was the proper venue for prosecuting Kendall's violation of the protective order due to D.K.'s

7

presence within Reno County on July 7, 2010, when she received Kendall's telephone calls. *Kendall*, 2013 WL 4404174, at *5-6.

STALKING

The State contends that Kendall's act of calling D.K.'s cell phone numerous times on July 7, 2010, and, in turn, D.K.'s recognition that Kendall was calling her was sufficient to show that Kendall committed an "act of communication" under the stalking statute. In order to resolve this issue, we must first construe the phrase "act of communication" to determine what actions are encompassed within this phrase. Our determination of this issue will shape the analysis of the second issue: Whether the evidence presented at trial was sufficient to show that Kendall committed an act of communication which violated the stalking statute as charged by the State.

"Interpretation of a statute is a question of law over which appellate courts have unlimited review." *State v. Dale*, 293 Kan. 660, 662, 267 P.3d 743 (2011). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). Furthermore, in *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010), we stated:

> "An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. [Citation omitted.] When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent. [Citation omitted.]"

8

A. *Construction of the Phrase "Any [A]ct of [C]ommunication"*

As mentioned above, the State charged Kendall with stalking in violation of K.S.A. 2010 Supp. 21-3438(a)(3). That particular subsection of the statute defines stalking as:

> "[A]fter being served with, or otherwise provided notice of, any protective order included in K.S.A. 21-3843, and amendments thereto, that prohibits contact with a targeted person, intentionally or recklessly engaging in at least one act listed in subsection (f)(1) that violates the provisions of the order and *would cause a reasonable person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear*." (Emphasis added.) K.S.A. 2010 Supp. 21-3438(a)(3).

K.S.A. 2010 Supp. 21-3438(f)(1) of the statute proscribes a "'[c]ourse of conduct,'" which is defined as

> "two or more acts over a period of time, however short, which evidence a continuity of purpose. A course of conduct shall not include constitutionally protected activity nor conduct that was necessary to accomplish a legitimate purpose independent of making contact with the targeted person. A course of conduct shall include, but not be limited to, any of the following acts or a combination thereof:
>
> . . . .
>
> "(G) Any act of communication."

K.S.A. 2010 Supp. 21-3438(f)(2) of the statute defines "'[c]ommunication'" as

> "*to impart a message* by any method of transmission, including, but not limited to: Telephoning, personally delivering, sending or having delivered, any information or material by written or printed note or letter, package, mail, courier service or electronic

9

transmission, including electronic transmissions generated or communicated via a computer." (Emphasis added.)

Construing the entire statute as a whole, we conclude that the phrase "act of communication" requires a showing that the perpetrator transmitted a communication to the victim. The word "act" is modified by the prepositional phrase "of communication." As used in the stalking statute, "communication" is defined as "to impart a message by any method of transmission . . . ." K.S.A. 2010 Supp. 21-3438(f)(2). Thus, an act which falls under the umbrella of K.S.A. 2010 Supp. 21-3438(f)(1)(G) ("A course of conduct shall include . . . [a]ny act of communication.") must result in the impartation of a communication or message to the victim by any method of transmission. See Webster's Third New International Dictionary 1131 (1993) (defining "impart" as "to give or grant . . . communicate, transmit" or "to communicate the knowledge of . . . disclose" or "to give utterance to . . . reveal in writing or speaking . . . ."); Webster's Third New International Dictionary 460 (1993) (defining "communicate" in part as "to make known . . . inform a person of . . . convey the knowledge or information of . . . ."). The statutory definition of "communication" indicates that an "act of communication" is more than a mere attempt at communicating with a victim; the act must entail the perpetrator sending a communication that is received by the victim.

K.S.A. 2010 Supp. 21-3438(a)(3) supports this conclusion. In addition to proof that the defendant engaged in a course of conduct (in this case, "[a]ny act of communication") that violates a protective order, subsection (a)(3) requires a showing that the course of conduct "would cause a reasonable person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear." K.S.A. 2010 Supp. 21-3438(a)(3). The requirement that the victim be placed in fear and that such fear be reasonable suggests that attempted forms of communication where the victim is never made aware that the

10

perpetrator tried contacting him or her would not constitute an "act of communication" or, in turn, a course of conduct sufficient to violate the statute.

Thus, we conclude that the phrase "act of communication" as used in the stalking statute requires evidence that a perpetrator transmitted a communication to a victim. Now, we must determine whether there was sufficient evidence presented at trial to establish this element.

B. *Did the State Present Sufficient Evidence to Establish That Kendall Imparted a Communication to D.K.?*

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Stafford*, 296 Kan. 25, 53, 290 P.3d 562 (2012); see *State v. Frye*, 294 Kan. 364, 374, 277 P.3d 1091 (2012) ("[C]onvictions arising from bench trials and those arising from jury trials are reviewed by this court utilizing the same standards on appeal."). In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. *Stafford*, 296 Kan. at 53. Furthermore, this court has recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom." *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 9, 245 P.3d 1030 (2011).

The evidence presented at trial clearly showed that D.K. had an abusive relationship with Kendall. Based on Kendall's conduct towards her, D.K. testified that she had a general fear of him. The evidence showed that Kendall routinely disregarded

protective orders that were put in place to prevent him from contacting D.K. Journal entries introduced into evidence at trial showed that on September 9, 2009, Kendall pleaded no contest to violating a protective order in Hutchinson Municipal Court and that on February 1, 2010, he entered guilty pleas in four separate cases originating in Reno County District Court: (1) 09-CR-819, two counts of stalking and one count of violating a protective order; (2) 09-CR-982, violating a protective order and eavesdropping; (3) 09-CR-907, three counts of stalking and one count of violating a protective order; and (4) 09-CR-1005, two counts of computer crime and one count of stalking. D.K. was the victim of all these crimes. Kendall was sentenced on March 5 for the four separate district court cases.

The protective order at issue in this case was established on February 22, 2010. Part of the basis for this new order was that D.K. had learned that Kendall had surreptitiously filmed and photographed her while she was bathing, undressing, and while she was unconscious (at trial, D.K. indicated that Kendall may have drugged her). Most disturbing, Kendall filmed himself sexually fondling D.K. and filmed himself masturbating until ejaculation while standing over her—all the while she was unconscious. According to the police officer who discovered the videos and pictures and later showed them to D.K., D.K. was very emotional upon seeing the material.

As noted above, the protective order, among other restrictions, directed Kendall not to "telephone, contact or otherwise communicate with" D.K. and not to "contact" her "either directly or indirectly."

D.K. indicated at trial that she determined on July 6 that the calls she was receiving on her cell phone from ICS were actually from Kendall. The record shows that on July 7—the date on which the charges now at issue arose—Kendall called D.K.'s cell phone three times. D.K. stated that when she realized the calls were from Kendall, she

was scared and in fear. During D.K.'s direct examination, the prosecutor asked her about her reaction upon receiving the telephone calls from Kendall.

"Q. How did receiving these nine phone calls from the defendant make you feel personally?

"A. *He had said during sentencing and even before that, that he would always find me. No matter what he would contact me. He would never leave me alone regardless of what I would do, and he would follow me across the country if he had to. He told me before he would hunt me down and kill me.*

"Q. Hunt you down and what?

"A. Hunt me down and kill me.

"Q. Kill you?

"A. Yes.

"Q. How did these phone calls make you feel when you got them from the prison?

"A. *That he was trying to prove to me he would still find me no matter what and he could get through the system no matter what.*

"Q. Did they cause emotional reaction on your part?

"A. Yes.

"Q. What was that?

"A. I was afraid. I was scared. I was sad. I—it just pretty well showed he would find me and my daughter." (Emphasis added.)

As mentioned above, the Court of Appeals majority believed that Kendall's act of simply placing calls to D.K.'s cell phone without ever speaking to her was insufficient to show that he engaged in an act of communication. Furthermore, the majority rejected the notion that the inference D.K. drew from receiving telephone calls from Kendall (*i.e.*, that Kendall would contact her no matter what she did) could constitute evidence of Kendall imparting a message to D.K. for purposes of the stalking statute. The majority stated:

13

"The evidence fails to show that was an established or common message they attached to his act of calling her. Again by way of illustration, a person untrained in semaphore might nonetheless recognize that someone was using that code and, thus, conclude he or she had learned the skill in the military. Whatever the accuracy of that conclusion, it would not be a communication in the sense that the semaphorist was imparting that message unless he or she actually was signaling, 'This is semaphore, and I learned to do this in the Navy.'

"The record evidence indicates D.K. had not changed telephone numbers, so Kendall had called what he already knew to be her number. He did not independently track down a new number D.K. intended to keep secret from him. That undercuts the notion that Kendall meant the calls to communicate the idea he could find D.K. even if she didn't want to be found. The State's position, at best, overtaxes the statutory language and imputes an unusual meaning to 'communication.' Again, even if that position were remotely plausible, it could not be reconciled with the rule of lenity." *Kendall*, 2013 WL 4404174, at *4.

Judge Buser disagreed with the majority's assessment of the evidence. He believed that a reasonable factfinder could conclude that actual communication occurred between Kendall and D.K. Judge Buser wrote:

"At trial, D.K. testified that prior to and during Kendall's March 5, 2010, sentencing for stalking, violation of a protective order, and computer crimes, he told her:

"'he would always find me. No matter what he would contact me. He would never leave me alone regardless of what I would do, and he would follow me across the country if he had to. He told me before he would hunt me down and kill me.'

"When D.K. later received the offending calls from Kendall in prison, she understood this to mean that Kendall 'was trying to prove to me he would still find me no matter what and he could get through the system no matter what.' In D.K.'s view, the

14

telephone calls communicated that, although he was in prison, Kendall could still contact D.K. and in this way threaten her or cause her to fear for her and her family's safety.

"Given D.K.'s past victimization by Kendall for exactly the same offense—stalking, there was a factual basis for an objective factfinder to conclude that the simple act of placing the call and its receipt by D.K. constituted a powerful and threatening communication, indeed. By placing the calls, Kendall had made good on his promise to continue stalking D.K. Upon receipt of the calls, D.K. understood that Kendall was, once again sending her a message. Spoken words or signals were unnecessary in this context. And D.K.'s reaction bolsters the conclusion that Kendall had very effectively communicated with her. She testified that she 'was afraid. I was scared. I was sad. I—it just pretty well showed he would find me and my daughter.'" *Kendall*, 2013 WL 4404174, at \*8-9.

We find Judge Buser's review of the evidence compelling. Kendall's acts of placing calls to D.K.'s cell phone on July 7 and, in turn, D.K. realizing that Kendall was calling her from prison were sufficient to show that Kendall engaged in an act of communication. Based on D.K.'s testimony, a reasonable factfinder could infer that by calling D.K.'s cell phone, Kendall was communicating to D.K.—just as he promised her at sentencing—that he would contact her no matter what, regardless of the protective order put in place or the fact that he was in prison, and that this message was received by D.K. Accordingly, we conclude that Kendall committed an act of communication towards D.K. sufficient to find him guilty of stalking in violation of K.S.A. 2010 Supp. 21-3438(a)(3).

## VIOLATION OF THE PROTECTIVE ORDER

Kendall raises two arguments for why the Court of Appeals erred in affirming his conviction for violating a protective order. First, he notes that in order to be convicted of this offense, there must be evidence showing that he "knowingly or intentionally" violated the protective order. See K.S.A. 2010 Supp. 21-3843(a)(1). Though he does not

dispute that he knowingly and intentionally called D.K.'s cell phone, that such conduct was in violation of the protective order, and that the district court found him guilty of violating the protective order, he argues that the judge, in announcing the verdict, found that he had *recklessly* violated the protective order. Kendall contends that the judge's finding of recklessness was the equivalent of an acquittal and that his conviction for violating a protective order should be reversed as a result.

Second, Kendall argues that because the State alleged in the complaint that he was in Reno County on July 7, 2010, when he violated the protective order, the State was required to prove this fact at trial. Kendall argues that because the evidence clearly showed that he was in Butler County at the time of the crime, the State failed to prove all the elements necessary to convict him of violating a protective order as charged in the complaint. Kendall's arguments will be addressed in turn.

A. *Did the District Court Find That Kendall's Act of Dialing D.K.'s Phone Number Was Reckless?*

The State charged Kendall with violating K.S.A. 2010 Supp. 21-3843(a)(1), which defines the crime of violating a protective order as "knowingly or intentionally violating: (1) A protection from abuse order issued pursuant to K.S.A. 60-3105, 60-3106 and 60-3107, and amendments thereto."

As noted above, the protective order at issue here directed Kendall not to "telephone, contact or otherwise communicate with" D.K. and not to "contact" her "either directly or indirectly." Kendall admitted to knowing about the restrictions put in place by the protective order. Despite this knowledge, however, Kendall conceded that he placed multiple calls to D.K.'s cell phone on July 7. He stated that his intent for doing so was to speak to their daughter, A.K. According to Kendall, he believed that a prior custody agreement with D.K. allowed him to call her in order to speak to A.K.

During closing arguments, the prosecutor noted that the stalking statute prohibited both intentional and reckless conduct and that Kendall's conduct, *as it related to the stalking charge*, could be considered either intentional or reckless. See K.S.A. 2010 Supp. 21-3438(a)(3) (prohibiting both intentional and reckless conduct). In response, defense counsel argued in part that Kendall's acts in calling D.K.'s cell phone were justified because he was trying to contact his daughter. See K.S.A. 2010 Supp. 21-3438(f)(1) ("A course of conduct shall not include constitutionally protected activity nor conduct that was necessary to accomplish a legitimate purpose independent of making contact with the targeted person.").

After finding Kendall guilty of stalking and violating a protective order, the district court explained its reasoning:

"As to the July 7th phone call I do find that the State has shown that the defendant at least recklessly disobeyed a protective order. The defendant, I'm certain that he is genuine in his effort to continue contact with his daughter. I don't believe the defendant was dishonest with the Court in that statement, but when you have created a situation which was of the defendant's own creation where you are under a protective order as to the child's mother, you are going to be limited in your contact with that child, and that protective order does not exempt any contact with the child. It does not say it's okay to contact [D.K.] if it's their daughter. It says the defendant is not to contact [D.K.]. Period. If, if it said otherwise, I might consider this case differently, but it doesn't and the contact was made with [D.K.]. That was the only way that the defendant could reach his daughter, I understand that, but again, the defendant, this situation is due to the defendant's actions. Most fathers don't have protective orders against them as to their child's mother. And whether the defendant had in mind, I hope [D.K.] answers this call and I wanted to talk to her, or I hope [D.K.] will hand the phone to [A.K.], I don't find, I don't know. But at any rate, I find sufficient evidence to say the defendant was reckless in making that call because he knew that was [D.K.'s] phone number, and she testified that

17

that focusing on the call on July 7th scared her, and I find she had good reason to be scared. No contact means no contact. Not having your phone number or your place of residence show up . . . on a victim's phone, or have some way for the victim to find out that, that you are the one making that call. So I am finding the defendant guilty as to Counts III and Count VII."

As mentioned above, the entire Court of Appeals panel concluded that Kendall was misconstruing the district court's findings at the conclusion of the bench trial. According to the panel, the district court did not find that Kendall's actions in calling D.K.'s cell phone were reckless and, thus, not intentional or knowing for purposes of the crime of violating a protective order. Instead, the panel construed the district court's statements as explaining that it was reckless or, stated another way, foolhardy for Kendall to rely on his prior arrangement with D.K. (*i.e.*, calling D.K.'s phone so Kendall could speak to their daughter) as a legal excuse or defense for his actions in calling D.K.'s cell phone. *Kendall*, 2013 WL 4404174, at *6.

Based on the evidence presented at the bench trial and the parties' closing arguments, we conclude that the Court of Appeals' interpretation of the judge's statements was correct. The judge was merely trying to explain why Kendall's explanation for calling D.K.'s cell phone did not prevent him from being convicted of stalking. The judge certainly did not find that Kendall's actions were reckless. Instead, the judge found that it was foolhardy or imprudent (*i.e.*, reckless) for Kendall to think that his intentional actions were justified by the custody agreement or whatever prior arrangement he had with D.K. for contacting their daughter.

Regardless of the district court's statements after finding Kendall guilty of both stalking and violating a protective order, in a criminal case, a district court is not required to explain its decision and may render the equivalent of a general verdict of guilty or not guilty. See *State v. Scott*, 201 Kan. 134, 137, 439 P.2d 78 (1968). We conclude that there

18

was sufficient evidence presented at the bench trial to show that Kendall intentionally and knowingly violated the protective order by calling D.K.'s cell phone.

B. *Was the State Required to Prove That Kendall Was in Reno County on July 7 in Order to Convict Him of Violating a Protective Order?*

Count VII of the complaint charging Kendall with violating a protective order stated:

> "That on or about the 7th day of July, 2010, in Reno County, Kansas, one Mark R. Kendall *then and there being present* did unlawfully, intentionally, and knowingly violate a protective order and/or restraining order, to wit: 10 DM 156, issued pursuant to K.S.A. 60-3105, 60-[31]06, and 60-3107, and amendments thereto." (Emphasis added.)

Kendall argues that because the State alleged in the complaint that he was in Reno County on July 7, 2010, when he violated the protective order, the State was required to prove that specific allegation in order to convict him of violating a protective order. He contends that because the evidence presented at the bench trial clearly showed that Kendall was incarcerated at the El Dorado Correctional Facility (located in Butler County) on July 7 when he called D.K.'s cell phone, his conviction for violating the protective order must be reversed.

Because the location of where Kendall violated the protective order is not an element of the crime, Kendall's argument essentially raises the question of whether Reno County was the proper venue for prosecuting him for the crime. See K.S.A. 2010 Supp. 21-3843(a)(1) (defining the crime of violating a protective order); *State v. Rivera*, 42 Kan. App. 2d 1005, 1008-10, 219 P.3d 1231 (2009) (unless specified in statute defining the crime, location of where the crime was committed is generally not an element of the

crime; however, venue is a necessary jurisdictional fact that must be proven along with the elements of the actual crime), *rev. denied* 290 Kan. 1102 (2010).

Because venue is jurisdictional and implicates the district court's subject matter jurisdiction, our standard of review is de novo. *State v. Jackson*, 280 Kan. 16, 20, 118 P.3d 1238 (2005), *cert. denied* 546 U.S. 1184 (2006). In this case, resolution of the venue issue also involves interpretation of K.S.A. 2010 Supp. 21-3843, which is subject to de novo review. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010).

K.S.A. 22-2602 authorizes the State to prosecute a crime in the county where the crime was committed. But, when two or more acts are requisite to the commission of the crime charged and such acts occur in different counties, K.S.A. 22-2603 authorizes the State to prosecute the crime "in any county in which any of such acts occur."

Again, K.S.A. 2010 Supp. 21-3843(a)(1) defines the crime of violating a protective order as "knowingly or intentionally violating: (1) A protection from abuse order issued pursuant to K.S.A. 60-3105, 60-3106 and 60-3107, and amendments thereto." As noted above, the protective order, among other restrictions, directed Kendall not to "telephone, contact or otherwise communicate with" D.K. and not to "contact" her "either directly or indirectly." At the bench trial, the State argued that Kendall violated the protective order by making three calls to D.K.'s cell phone on July 7 which placed her in fear. D.K. testified that she was in Reno County on July 7 when she received the calls on her cell phone and that the calls placed her in fear.

Based on the restrictions within the protective order preventing Kendall from communicating with or contacting D.K., we conclude that pursuant to K.S.A. 22-2603, a violation of this particular protective order could be prosecuted in the county where Kendall initiated the contact (*i.e.*, Butler County) or the county where D.K. received the

20

contact (*i.e.*, Reno County). See Webster's Third New International Dictionary 490 (1993) (defining "contact" in part as "an instance of establishing communication with someone . . . or of observing or receiving a significant signal from a person or object . . . ."). D.K.'s testimony at trial established that she was in Reno County on July 7 when she received Kendall's telephone calls in violation of the protective order. Accordingly, the State satisfied the requirement of showing that Reno County was a proper venue for prosecuting Kendall's crime. The language within the complaint suggesting that Kendall was in Reno County on July 7 when he made the phone calls is mere surplusage that can be disregarded. See K.S.A. 22-3201(d) ("The court may strike surplusage from the complaint, information or indictment."); *State v. Glazer*, 223 Kan. 351, 359, 574 P.2d 942 (1978) ("Surplusage in the information may be disregarded. We do not feel that defendant was prejudiced in his defense even though the information set forth many unessential facts.").

Judgment of the Court of Appeals affirming in part, reversing in part, and remanding to the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed.

MORITZ, J., not participating.

21