NOT DESIGNATED FOR PUBLICATION

No. 115,138

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER SCOTT GRAY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed November 23, 2016. Affirmed.

*Rex L. Lane*, of Lane Law Office LLC, of Atchison, for appellant.

*Gerald R. Kuckelman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., ATCHESON and ARNOLD-BURGER, JJ.

PIERRON, J.:  Christopher Gray was convicted of stalking, in violation of K.S.A. 2015 Supp. 21-5427(a)(2). Gray appeals his conviction, asserting there was insufficient evidence presented at trial to sustain his conviction. We affirm.

The following facts are based entirely on the testimony of the victim, Amanda Kuhn, and Officer Travis Eichelberger of the Atchison Police Department, who spoke to Kuhn shortly after an incident of alleged stalking. The only additional evidence presented at trial was a video recording of Gray's actions on April 17, 2015, which was reviewed by the district court.

1

According to Kuhn, she and Gray met on Facebook in early November 2014 and went on one date. After this date, Gray and Kuhn developed some type of relationship, described by Kuhn as "[f]riends hanging out," that lasted approximately 6 to 8 weeks. During this period, Kuhn stayed the night with Gray, at Gray's residence, approximately 2 or 3 nights a week. Kuhn also placed Gray's Internet bill in her name for a 1-to-2-week period during the course of their relationship.

In late December 2014 or early January 2015, the relationship between Gray and Kuhn began to deteriorate. Kuhn sought to end the relationship because Gray had become increasingly angry and had begun driving by her house frequently, sitting across from her parent's house, going to her place of employment and waiting outside for her, placing objects on her car, calling her numerous times, and leaving threatening voicemails when she did not answer the phone. According to Kuhn, Gray had threatened her in person and grabbed her on multiple occasions. Despite Kuhn's desire to end the relationship, Gray continued to pursue and attempt to contact her.

Gray's actions prompted Kuhn to seek what the State described as a "protection from stalking" order against Gray in January 2015. A temporary order was granted in early January, and a final order was issued on January 26, 2015. The specific orders served on Gray are not present in the record, but the trial transcript makes it clear that Gray was served with some form of order in January 2015. This order is referred to as a "restraining order" by Kuhn, a "protection from stalking order" by the prosecutor, a "protection from abuse order" by defense counsel, and a "p.f.a. [protection from abuse]" by the trial judge.

Kuhn testified that after the initial order was issued, Gray's attempts to contact her largely subsided. Kuhn testified, however, that on multiple occasions after the initial order was granted, Gray called her and left threatening voicemails. Kuhn testified that

2

because of Gray's prior actions, these phone calls and voicemails made her fear for her safety. Kuhn testified she told the police Gray had called her and left these voicemails, but no police report regarding these phone calls or voicemails is present in the record.

The last contact between Gray and Kuhn occurred on April 17, 2015, at the Casey's General Store in Atchison, where Kuhn was employed. Kuhn began working at Casey's approximately 2 weeks prior to this incident and had not personally informed Gray of her change in employment. Kuhn testified that Gray had driven through the parking lot a couple of times while she was working, implying he was aware of her change in employment because he would have seen her working in the store and noticed her car parked outside.

On April 17, Kuhn arrived at Casey's at approximately 3:50 p.m. because she was scheduled to work at 4 p.m. Upon entering the parking lot, Kuhn noticed Gray standing in the parking lot, near his vehicle and the fuel pumps, talking to a woman. Kuhn drove to the opposite end of the parking lot, parked her car, and waited in for Gray to leave. While she was waiting, Gray entered the store. After several minutes of waiting for Gray to leave, Kuhn entered the store in order to clock in before her shift was scheduled to start. As Kuhn was entering the store Gray was exiting, and the two passed through the door simultaneously. Kuhn was unsure if Gray had noticed her as they passed through the doorway because she had dialed the nonemergency police number on her phone and was looking at her phone as they crossed paths. Kuhn stated she had predialed this number in case there was an issue with Gray.

Gray returned to the fuel pumps, presumably pumped his gas, and then appeared to linger around the fuel pumps for approximately 3 1/2 to 4 minutes before leaving. Kuhn testified she believed Gray was in the parking lot longer than he needed to be and this act was an attempt to intimidate her. The incident was recorded by cameras located inside Casey's. They recorded a clear view of the inside of the store and a partially

3

obstructed view of area near the pumps where Gray had parked. This footage was admitted into evidence and reviewed by the district court.

Approximately 1/2 hour after the incident at Casey's took place, Officer Eichelberger entered the store to make a purchase. Kuhn asked him for advice regarding the incident. Officer Eichelberger reviewed the footage of the incident captured by the store's cameras before leaving the store. At trial Officer Eichelberger testified to what he had witnessed while watching this footage and, in his opinion, Gray had lingered near the pumps for an exorbitant amount of time.

The State charged Gray with one count of stalking, in violation of K.S.A. 2015 Supp. 21-5427(a)(2), and one count of violation of a protective order, pursuant to K.S.A. 2015 Supp. 21-5924(a)(6). At a bench trial, upon reviewing the testimony of Kuhn and Officer Eichelberger, and viewing the footage recorded by the store's cameras, the district court found Gray guilty of stalking and not guilty of violating the protection order. Gray timely appeals.

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015).

In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). It is only in rare cases where the testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6,

660 P.2d 945 (1983); see *State v. Naramore*, 25 Kan. App. 2d 302, 322, 965 P.2d 211, *rev. denied* 266 Kan. 1114 (1998).

K.S.A. 2015 Supp. 21-5427(a)(2) defines "stalking" as "engaging in a course of conduct targeted at a specific person with knowledge that the course of conduct will place the targeted person in fear for such person's safety . . . ." For purposes of this statute, "course of conduct" means "two or more acts over a period of time, however short, which evidence a continuity of purpose." K.S.A. 2015 Supp. 21-5427(f)(1). A course of conduct includes, but is not limited to, "(B) following, approaching or confronting the targeted person . . . ; (C) appearing in close proximity to, or entering the targeted person's residence, place of employment, school or other place where such person can be found . . . ; (E) placing an object on the targeted person's property . . . ; (G) or any act of communication." K.S.A. 2015 Supp. 21-5427(f)(1). In relevant part, "communication" means "to impart a message by any method of transmission, including, but not limited to: Telephoning, personally delivering, . . . . or electronic transmission . . . " K.S.A. 2015 Supp. 21-5427(f)(2).

In addition to engaging in a course of conduct targeted at a specific person, the defendant must have known that his or her conduct would cause the targeted person to fear for his or her safety or the safety of others. K.S.A. 2015 Supp. 21-5427(a)(2). A defendant is presumed to have this knowledge if he or she has been served with a protective order, as defined in K.S.A. 2015 Supp. 21-5924, or that person engaged in acts constituting stalking after a law enforcement officer informed that person such acts would constitute stalking as defined in K.S.A. 2015 Supp. 21-5427. K.S.A. 21-5427(e).

Though the appellate courts have not addressed at what point appearing in close proximity to a person's place of employment may amount to the course of conduct requisite of stalking, the Kansas Supreme Court has addressed telephone communications in this context. In *State v. Kendall*, 300 Kan. 515, 524-26, 331 P.3d 48 (2014), the court

5

addressed whether unanswered telephone calls met the definition of communication as required to support a conviction for stalking. Finding in the affirmative, the court held that a reasonable factfinder could determine that the act of calling a person is an act of communication sufficient to support a stalking conviction if the victim was aware of the missed call. 300 Kan. at 526. The court based its decision largely on the victim's testimony that she had received multiple phone calls from a number she knew to be associated with the defendant and that these calls caused her to fear for her safety due to her history with the defendant. 300 Kan. at 526

In the present case, viewing the evidence in the light most favorable to the prosecution, the record indicates there was evidence sufficient to support a conviction presented at trial. To support the conviction, evidence must have been introduced that Gray engaged in the requisite course of conduct and had knowledge that doing so would cause Kuhn to fear for her safety. K.S.A. 2015 Supp. 21-5427(a)(2).

As stated above, a course of conduct means two or more acts over a period of time that evidence a continuity of purpose. K.S.A. 2015 Supp. 21-5427(f)(l). This course of conduct may consist of actions such as appearing at the person's place of employment, as stated in the statute, or through any act of communication, such as the unanswered phone calls in *Kendall*. See K.S.A. 2015 Supp. 21-5427(f); 300 Kan. at 526. Kuhn's uncontroverted testimony at trial established that Gray had driven by her house several times, sat across from Kuhn's parent's house, and appeared at her place of employment multiple times, all of which show Gray's actions were continuous and targeted at Kuhn or her family. Further, Kuhn testified that subsequent to the order being issued by the district court, Gray left multiple threatening voicemails specifically addressed at her. Leaving voicemails, which Kuhn listened to, clearly surpasses the level of communication used to sustain the conviction in *Kendall*, as actual words were electronically transmitted to Kuhn. Finally, video evidence of the events that transpired at Casey's, as well as the testimonies of Kuhn and Officer Eichelberger regarding this

incident, was presented at trial and reviewed by the district court. Based on the events that transpired before the order was issued, the multiple phone calls and threatening voicemails that were left after the order was issued, and the events that transpired at Casey's, a rational factfinder could have found that Gray engaged in two or more acts amounting to a "course of conduct," as defined in K.S.A. 2015 Supp. 21-5427(f)(1).

Additionally, Gray must have engaged in this course of conduct with knowledge that it would cause Kuhn to fear for her safety. K.S.A. 2015 Supp. 21-5427(a). Knowledge is presumed if the course of conduct occurred after the defendant was served with a protective order as defined in K.S.A. 2015 Supp. 21-5924. The definition of protective order provided in K.S.A. 21-5924 includes many types of orders issued pursuant to various statutes, including certain protection from abuse orders, restraining orders, and protection from stalking orders. The specific orders served on Gray are not present in the record, but the trial transcript make it clear that he was served with some form of order in January 2015. This order is referred to as a "restraining order" by Kuhn, a "protection from stalking order" by the prosecutor, a "protection from abuse order" by defense counsel, and a "p.f.a." by the trial judge. Because the order is not present in the record it cannot be determined if the order referred to by these parties meets the definition of "protective order" as defined in K.S.A. 2015 Supp. 21-5924, which would have created a presumption of knowledge by Gray. However, the presence of some form of order limiting Gray's ability to contact Kuhn indicates he had knowledge that future contact with Kuhn would cause her to fear for her safety. Kuhn also testified that she had asked Gray to leave her alone after she had terminated their relationship. Thus, although the order is not present in the record, testimony was presented at trial that would have allowed a rational factfinder to determine that Gray possessed the requisite knowledge to sustain a conviction for stalking.

In sum, evidence was presented at trial that Gray communicated with Kuhn multiple times and showed up at her place of employment after having been served with

7

some form of an order restricting his ability to communicate with her. Thus, evidence sufficient to meet both elements of K.S.A. 2015 Supp. 21-5427(a)(2) was presented to the finder of fact at trial.

Affirmed.

* * *

ATCHESON, J., dissenting:  After a short bench trial, the Atchison County District Court found Christopher Gray guilty of stalking Amanda Kuhn by engaging in a course of conduct he knew would place her in fear for her safety. The evidence, taken in the best light for the State, fails to establish Gray acted in that particular way and, rather, shows only that Kuhn considered Gray's actions to be distressing. But those actions either were not inherently threatening or were so vaguely described during the trial as to be inscrutable. Given those limitations, the conviction necessarily rests on unwarranted supposition and speculation. I, therefore, respectfully dissent and would reverse Gray's conviction.

Gray was charged with and convicted of violating K.S.A. 2015 Supp. 21-5427(a)(2), a class A misdemeanor. This form of stalking requires the State to prove a defendant has "engaged in a course of conduct targeted at a specific person with knowledge that the course of conduct will place the targeted person in fear for such person's safety." K.S.A. 2015 Supp. 21-5427(a)(2). Key here is the requirement the defendant know that the conduct will induce fear in the victim. As defined in K.S.A. 2015 Supp. 21-5202(i), a criminal defendant acts "with knowledge" if he or she appreciates that specific conduct is "reasonably certain to cause" a particular result. See *State v. Hobbs*, 301 Kan. 203, 210-11, 340 P.3d 1179 (2015) (considering statutory definition of "with knowledge" in analyzing elements of aggravated battery).

8

Accordingly, based on the charge, the State had to prove Gray was reasonably certain that what he did would cause Kuhn to fear for her safety. That requisite state of mind may be proved with circumstantial evidence; and often that will be the only evidence on the point. *State v. Griffin*, 279 Kan. 634, 638, 112 P.3d 862 (2005); *State v. Denton*, No. 111,085, 2015 WL 5036669, at *7 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016). To facilitate proof of intent to stalk, the Kansas Legislature adopted a statutory presumption that a person served with a protective order who then engages in conduct prohibited by the order acts with the knowledge required to establish a violation of K.S.A. 2015 Supp. 21-5427(a)(2). K.S.A. 2015 Supp. 21-5427(c).

In reviewing Gray's challenge to the sufficiency of the evidence, I necessarily look at the trial record in a light favoring the State and by resolving any conflicts in the evidence in support of the district court's judgment of conviction. See *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006).

For roughly 2 months in late 2014, Kuhn had a relationship with Gray in which she spent 2 or 3 nights a week at his residence. The evidence at trial did not really provide any more clarity about the nature of their relationship. All we can say without adding a veneer of surmise is that Gray and Kuhn spent time together and that she was a frequent overnight houseguest of his. By the end of the year, Kuhn wanted to end the relationship. Again, we don't know exactly how she communicated this to Gray. At trial, Kuhn characterized Gray as becoming increasingly angry as the relationship fizzled. Without any elaboration, she also testified she "felt like he was very irrational."

Gray repeatedly went out of his way to initiate contact with Kuhn:  He left messages on her telephone; he drove by and parked near her home and her parents' home; and he visited her workplaces. Kuhn testified that Gray once left a bouquet of flowers on

the hood of her car. But she offered no details about anything else Gray did or how frequently he turned up around her home or work.

In January 2015, Kuhn apparently obtained both preliminary and final orders from the Atchison County District Court restricting Gray's contact with her. During the criminal trial, the lawyers and the district court refer to the orders. And Kuhn testified she got such an order. Neither the preliminary nor final order was offered or admitted as an exhibit during the trial. The district court was not asked to and did not take judicial notice of either order. Nothing in the trial record, including Kuhn's testimony, establishes any specific limitation or prohibition imposed on Gray. I infer the orders to have been issued under the Protection from Stalking Act, K.S.A. 60-31a01 *et seq.* But that's no more than an assumption on my part.

At trial, Kuhn testified that Gray "threatened" her in person "a couple of times." But Kuhn was never asked exactly what it was Gray said or did that she found threatening. Nor does the trial record suggest precisely when any of that conduct took place. Kuhn testified that after the protection order was entered, Gray left two or three voice messages on her telephone that she found threatening. She was not asked about and didn't recount the content of the messages. Finally, Kuhn described Gray coming to the convenience store where she worked in April 2015 and purchasing gas for his car. Gray did not speak to her but lingered for a little while around the gas pumps after filling up his car.

Gray did not testify in his own defense and presented no other witnesses.

Taking account of the State's burden to prove Gray acted "with knowledge" his conduct would place Kuhn in fear for her safety—that is, he was "reasonably certain" of the result—the trial evidence fails as a matter of law. What we have is the unraveling of a relationship that Kuhn wanted to end and Gray did not. Gray at least several times

10

communicated with Kuhn in ways she considered threatening. Without some facts to lend a foundation to Kuhn's characterization, all we have is her subjective opinion. But to be convicted, Gray had to know his conduct was likely threatening. Without something more, we can only arrive there through impermissible speculation—really clairvoyance—about what was communicated. That's not good enough. See *State v. Williams*, 229 Kan. 646, 663-64, 630 P.2d 694 (1981); *State v. Perez-Rivera*, 41 Kan. App. 2d 579, 581-83, 203 P.3d 735 (2009); *State v. Judd*, No. 112,606, 2016 WL 2942294, at *2 (Kan. App. 2016) (unpublished opinion) ("[C]onvictions may not rest on speculation or surmise.").

For example, had Gray left a voicemail that said he was going to come over to Kuhn's house and kill her cat unless they got back together, we could easily conclude from those circumstances he would know the communication to be threatening and intended to induce fear. Conversely, if the message were a profession of Gray's love for Kuhn and a desire to spend the rest of his life with her, we would have an entirely different situation. Kuhn, of course, could well find that sort of message unwelcome and very likely quite annoying, and she understandably might summarily label it threatening in a creepy way. But I would be hard pressed to say Gray ought to know such a message would induce Kuhn to fear for her safety. Such a communication would make a strong case for Gray being socially inept and romantically tone-deaf but not for a violation of K.S.A. 2015 Supp. 21-5427(a)(2). The problem here is we have no factual basis for determining whether Gray's communications are like the first example, like the second, or something else altogether.

The same is essentially true of Gray's turning up outside Kuhn's residence and her workplaces. Without additional context that is missing here—say earlier explicit or implicit threats of physical violence Gray directed at Kuhn—he could have considered those actions to be reflective of his continuing affection rather than conduct he would understand as inducing fear. The bouquet on the car hood suggests as much. On its face, that's a benign gesture, if, again, a maladroit one under the circumstances. We have no

11

way of coming to any reasoned conclusion about Gray's understanding of how those actions might have affected Kuhn.

In this case, the statutory presumption in K.S.A. 2015 Supp. 21-5427(c) cannot be applied in any meaningful way. The terms of the orders limiting or prohibiting Gray from interacting with Kuhn do not appear in the trial record or the record on appeal for that matter. Accordingly, we have neither a factual nor a legal basis to presume Gray acted "knowingly," as required by K.S.A. 2015 Supp. 21-5427(a)(2), because his conduct violated the terms of an order of protection. We simply don't know what the order prohibited. We might assume the orders directed Gray to have no communication with Kuhn and to stay some specified distance from her home and possibly the places she worked. But we could say that only because those kinds of prohibitions are common in protection orders. We can't convert that assumption into evidence of what the orders applicable to Gray actually did prohibit. We would be guessing.

The State failed to offer direct or circumstantial evidence establishing Gray acted with the requisite intent necessary to show a violation of K.S.A. 2015 Supp. 21-5427(a)(2), the particular way the crime of stalking was charged in this case. The conviction, rather, rests on speculation lacking any evidentiary basis in the trial record. I, therefore, would reverse the conviction.