No. 124,559

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES DICK LOGANBILL,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 2019 Supp. 21-5427(a)(1) requires a person targeted by someone accused of reckless stalking (1) to subjectively fear the accused's course of conduct proving stalking and (2) to have an objectively reasonable fear of the accused's course of conduct proving stalking.

2.

Under K.S.A. 2019 Supp. 21-5427(a)(1), a person targeted by someone accused of reckless stalking may fear for his safety, her safety, or a family member's safety after the accused engaged in the course of conduct proving stalking.

3.

The key question when deciding whether an accused stalker's disputed behavior constituted a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1)'s definition of "course of conduct" is whether the accused's behavior evidenced his or her continuity of purpose to target the person in a way that would reasonably cause the targeted person to fear for his safety, her safety, or a family member's safety.

4.

Secretly photographing and filming a person repeatedly may constitute a course of conduct proving stalking as meant under K.S.A. 2019 Supp. 21-5427(f)(1)'s definition of "course of conduct."

5.

Children are less mature than responsible adults. When deciding whether a child targeted by someone accused of reckless stalking in violation of K.S.A. 2019 Supp. 21-5427(a)(1) objectively feared for his safety, her safety, or a family member's safety, a fact-finder must consider the child's maturity and age in its analysis.

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed September 23, 2022. Affirmed.

*Carl E. Cornwell*, of Olathe, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., ISHERWOOD and COBLE, JJ.

GREEN, J.: James Dick Loganbill contends that there is insufficient evidence to support his reckless stalking conviction based on his interpretation of the reckless stalking statute, K.S.A. 2019 Supp. 21-5427(a)(1). According to Loganbill, K.S.A. 2019 Supp. 21-5427(a)(1) requires the reckless stalking victim, who is called the "targeted person" under the statute, to fear for his safety, her safety, or a family member's safety as the accused engages in the course of conduct proving stalking. Also, he argues that his disputed behavior did not constitute a course of conduct that could prove stalking under K.S.A. 2019 Supp. 21-5427(f)(1), which defines the term course of conduct. Alternatively, he argues that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language

is unconstitutionally vague because it allows the targeted person's subjective fear to control what constitutes a course of conduct proving stalking.

Nevertheless, there are several loose notions with Loganbill's arguments. His suggested statutory interpretation of K.S.A. 2019 Supp. 21-5427 is not supported by the clear text of this statute. In addition to ignoring contrary Kansas Supreme Court precedent, Loganbill's arguments are baseless as a matter of fact and wrong as a matter of law. As a result, we conclude that sufficient evidence supports Loganbill's reckless stalking conviction under a proper interpretation of K.S.A. 2019 Supp. 21-5427 and under Loganbill's suggested flawed interpretation of K.S.A. 2019 Supp. 21-5427. Thus, we affirm Loganbill's reckless stalking conviction.

FACTS

Loganbill was a teacher in the Olathe school district for many years. During the 2019-2020 school year, Loganbill worked as a fourth-grade teacher. A.A., who was 10 years old, was in Loganbill's fourth-grade class. A.M. and A.J., who were A.A.'s friends, were also in Loganbill's class.

Throughout the school year, A.A., A.M., and A.J. observed that Loganbill gave A.A. special treatment. For example, they noted that A.A. would not get in trouble when she did something wrong, like talking in class, while other students would get in trouble for the same misbehavior. A.A. noticed that unlike other students, Loganbill would specifically invite her to eat lunch with him. Additionally, A.A. noticed that she got extra help on her schoolwork. For instance, A.A. was able to use a calculator on her math tests while her classmates could not.

Although A.A. noticed this favoritism, A.A. did not question Loganbill's interest in her since it meant that he was "understanding" of her mistakes on schoolwork.

3

Likewise, K.A., who was A.A.'s mother, did not question Loganbill's favoritism because A.A. had told her that Loganbill saw her as a role model for her classmates. A.A. even told K.A. that this was why he had her sit at the front of the class near him. Of note, from August 2019 to March 2020, A.A. sat directly in front of Loganbill's desk, with her back facing Loganbill. Meanwhile, A.M.'s desk was directly across from A.A.'s desk. So, A.M.'s desk faced both A.A.'s and Loganbill's desks.

In addition to this partiality, A.A. observed that Loganbill seemed interested in the fact that she was a competitive dancer. Loganbill would bring up A.A.'s dancing "almost every single day." Loganbill sometimes talked to A.A. about watching her dance performances that K.A. had posted on YouTube. He asked her where her dance studio was located. Once when Loganbill overheard A.A. talking to her classmates about having a dance competition that weekend, Loganbill asked A.A. where her competition was located. Also, once after seeing A.A. and her friends practicing "leg holds," a stretch that requires a person to hold his or her leg up to his or her ear, Loganbill asked A.A. and her friends to compete who could hold their leg up the longest.

When Loganbill had A.A. and her friends have the leg hold competition, he filmed it on either his cell phone or iPad. This was not unusual behavior for Loganbill. A.A., A.M., and A.J. all noticed that Loganbill often had his cell phone or iPad out. Loganbill told A.A. that he was filming the class in case anybody misbehaved. He explained to A.A. that by filming the class, he would have proof of the misbehavior to show the offending student's parents later on. Yet, as the school year advanced, A.M. became concerned about Loganbill's cell phone and iPad use. She noticed that Loganbill "kept staring at [A.A.'s] butt a lot," which he also appeared to frequently photograph or film. Once, when A.A. stood up to adjust her pants, A.M. "noticed [that Loganbill] grabbed his phone and . . . pointed his phone at [A.A.'s] butt."

4

On Friday, March 6, 2020, because she was concerned about Loganbill's behavior, A.M. told A.J. that she believed that Loganbill might be photographing or filming A.A.'s buttocks. A.J. immediately told K.B., her mother, about A.M.'s allegation against Loganbill. Still, because A.J. had not seen Loganbill photograph or film A.A. herself, K.B. did not immediately notify the school's principal about A.M.'s allegation. Rather, she waited until the end of the day, Monday, March 9, 2020, to tell the principal that A.M. and A.J. believed that Loganbill was photographing and filming A.A.'s buttocks. After school that day, A.J. told her that she had seen Loganbill angle his cellphone at A.A.'s buttocks while studying math.

Once K.B. told the principal that A.M. and A.J. believed that Loganbill was photographing and filming A.A.'s buttocks, the principal immediately contacted the school district's safety service officer. The safety service officer, in turn, started investigating A.M.'s and A.J.'s allegation against Loganbill. But in an attempt (1) to further investigate A.M.'s and A.J.'s allegation against Loganbill and (2) to prevent Loganbill from destroying any evidence on his cell phone or iPad, the safety service officer told the principal to not tell Loganbill about the investigation. For this same reason, the principal told A.M. and A.J. to not tell A.A. about their allegation against Loganbill. Also, it seems for this same reason, the school allowed Loganbill to continue teaching.

The March 10, 2020 school day started normally for A.A. But during lunch, A.A. overheard A.J. ask A.M., "Did you tell the principal yet?" A.M. responded, "Yes." Upon hearing this, A.A. asked A.M. and A.J. what they were talking about. A.M. and A.J. initially resisted A.A.'s request. Yet, once on the playground for recess, A.M. and A.J. told A.A. that they believed that Loganbill was photographing and filming her from the "waist down."

5

When A.M. and A.J. told A.A. that Loganbill was photographing and filming her buttocks, at first, she did not want to believe them. But when she realized that "they weren't joking around," she started crying.

Following recess, A.A., A.M., and A.J. decided to "test" whether Loganbill would photograph or film her when she got up to get a tissue from across the room. During that test, A.M. and A.J. saw Loganbill "take out his phone and move the camera" towards A.A. As a result, A.M. and A.J. told A.A. to sit down immediately, which she did.

When K.A. picked up A.A. from school on March 10, 2020, A.A. could not stop crying. A.A. told K.A "that something really bad had happened at school that day, at recess, and that she didn't feel comfortable talking about it in front of her brother and sister," who were in the car. She also told K.A. that her stomach hurt. Once away from her siblings, A.A. explained everything that had happened that day to K.A. At this point, K.A. immediately contacted the principal, who confirmed the ongoing investigation into Loganbill for photographing and filming A.A.'s buttocks.

Before the school day started on March 11, 2020, the principal and safety service officer met with Loganbill. When the principal and safety service officer confronted Loganbill about photographing and filming A.A.'s buttocks, Loganbill admitted that he had done so throughout the school year. Loganbill told the principal and safety service officer that he was attracted to A.A. He explained that he particularly liked when A.A. wore black leggings to school. Also, Loganbill willingly gave the principal and the safety service officer access to his cell phone and iPad. When they searched his cell phone and iPad, they found numerous photos and videos that focused on A.A.'s buttocks. Regarding the videos specifically, the safety service officer noticed that many of the videos zoomed in on A.A.'s buttocks or were of A.A.'s buttocks as she bounced on a medicine ball chair that Loganbill allowed her to use instead of a standard chair.

6

Because the principal and safety service officer were concerned that Loganbill's conduct was criminal, they contacted the Olathe Police Department at the end of the meeting. Once the police arrived at the elementary school, Loganbill voluntarily left with them, agreeing to a formal interview with a detective at the police station. During that voluntary interview, Loganbill once again admitted to photographing and filming A.A.'s buttocks. He told the detective that he realized that his behavior was "creepy" and that "it was something he shouldn't have done." By the conclusion of its investigation, the police found 210 photos and 31 videos of A.A.'s buttocks. None of the photos of A.A. showed her face.

Based on Loganbill's conduct, the State charged Loganbill with reckless stalking in violation of K.S.A. 2019 Supp. 21-5427(a)(1). This provision stated that a person recklessly stalks another by "[r]ecklessly engaging in a course of conduct targeted at a specific person which would cause a reasonable person in the circumstances of the targeted person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear." K.S.A. 2019 Supp. 21-5427(a)(1). The State alleged that Loganbill's course of conduct targeted at a specific person proving stalking was his secret photographing and filming of A.A.'s buttocks throughout the school year.

Eventually, Loganbill moved to dismiss his reckless stalking charge under K.S.A. 22-3208. He argued that under K.S.A. 2019 Supp. 21-5427(a)(1), the targeted person must fear for his safety, her safety, or a family member's safety as the accused engages in the course of conduct proving stalking. In making this argument, Loganbill conceded that no caselaw expressly supported his interpretation of K.S.A. 2019 Supp. 21-5427(a)(1). Even so, he alleged that the Kansas stalking cases he had reviewed "involve[d] repeated conduct that the targeted victim was then-presently aware of." He also argued that there was no evidence that A.A. feared for her safety as he photographed and filmed her

7

buttocks. So, Loganbill argued that under his interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) and the facts of the case, he had not recklessly stalked A.A.

The State countered that Loganbill was misinterpreting K.S.A. 2019 Supp. 21-5427(a)(1). It argued that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language did not require the targeted person to fear for his safety, her safety, or a family member's safety as the accused engages in the debated course of conduct proving stalking. It argued that Loganbill's interpretation was unreasonable because it allowed an accused stalker who completed a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1) to avoid prosecution if he or she completed that course of conduct before the targeted person learned about it. As an example, it argued that Loganbill's interpretation allowed an accused stalker to avoid criminal prosecution just because the targeted person learned that the accused repeatedly hid outside his or her house at night after later reviewing home-surveillance video. Alternatively, it argued that Loganbill's argument about whether A.A. feared for her safety when he photographed and filmed her was a factual dispute for the fact-finder to decide at trial.

After a hearing on Loganbill's motion to dismiss, the trial court denied his motion. Although the court determined that the targeted person must subjectively fear for his safety, her safety, or a family member's safety at some point, it ruled that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language did not require the targeted person to experience this subjective fear when the accused engages in the course of conduct proving stalking. In making this ruling, the court stressed that Loganbill cited no authority supporting his interpretation of K.S.A. 2019 Supp. 21-5427(a)(1). Then, after finding that no Kansas caselaw addressed this specific issue, the trial court looked to persuasive authority for guidance. It found that the cases *State v. Russell*, 101 Conn. App. 298, 319-20, 922 A.2d 191 (2007), and *People v. Norman*, 75 Cal. App. 4th 1234, 1240-41, 89 Cal. Rptr. 2d 806 (1999), undermined Loganbill's interpretation of K.S.A. 2019 Supp. 21-5427(a)(1). The trial court explained that in both those cases, the respective

8

courts found that the targeted person does not have to feel afraid while the accused engages in a stalking course of conduct. It explained that the cases were persuasive because like Kansas' reckless stalking statute, the stalking statutes at issue in *Russell* and *Norman* had "both a subjective and objective requirement that the victim experience fear." Additionally, the trial court agreed with the State's argument that Loganbill's suggested interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) was unreasonable because it allowed an accused stalker to avoid prosecution just because he or she completed the course of conduct proving stalking before the targeted person discovered or learned about that course of conduct.

Ultimately, the trial court held a bench trial, where the State relied on the testimony of A.A., A.M., A.J., K.A., K.B., the safety service officer, and the detective who interviewed Loganbill to prove its reckless stalking charge against Loganbill. During their testimony, the State's witnesses discussed their role in discovering that Loganbill was photographing and filming A.A. as well as how A.A. responded to this discovery. When asked about how she felt immediately after learning about Loganbill's conduct during recess on March 10, 2020, A.A. testified that she was scared.

> "I was—first I was scared and frightened for me, my family, for [A.J.], for [A.M.]. Then second of all, I was heartbroken because I was in fourth grade and I didn't really know what a lot of the words that they were saying. And I just didn't think it was going to happen to me. Like I see all these stories, I see it on the news, and I just thought to myself, Why—like, this isn't—it's not—this isn't normal. Like, I live in Olathe where we have a nice house, I have a nice mom and dad, nice brother and sister, I play sports. And I just didn't think it was going to happen to me, to anyone.
> "And I was very shocked. I was scared. And I just wanted to be with my mom and dad, and I just wanted to never go to school again."

Following the State's case, Loganbill did not present evidence in his defense or contest the State's evidence. Instead, Loganbill repeated the arguments in his motion to dismiss, asserting that the trial court wrongly denied his motion.

In the end, the trial court found Loganbill guilty of recklessly stalking A.A. In doing so, the trial court never found that secretly photographing and filming A.A.'s buttocks repeatedly constituted a specific course of conduct described under K.S.A. 2019 Supp. 21-5427(f)(1)(A)-(G)'s nonexclusive list of courses of conduct that may prove stalking. Rather, the trial court found that Loganbill's behavior was consistent with K.S.A. 2019 Supp. 21-5427(f)(1)'s definition of course of conduct. The court supported its conclusion by reasoning that Loganbill had repeatedly engaged in intentional behavior, evidencing his ongoing purpose to target A.A. with objectively fear-provoking behavior.

The trial court sentenced Loganbill to serve 12 months in jail. This was the maximum sentence that the trial court could impose upon Loganbill, whose violation of K.S.A. 2019 Supp. 21-5427(a)(1) constituted a Class A person misdemeanor because it was Loganbill's first stalking conviction. See K.S.A. 2019 Supp. 21-5427(b)(1)(A).

Loganbill timely appeals his reckless stalking conviction.

ANALYSIS

*Should Loganbill's reckless stalking conviction be reversed?*

On appeal, Loganbill argues that there was insufficient evidence to support his reckless stalking conviction based on his interpretation of K.S.A. 2019 Supp. 21-5427 for two reasons: (1) because there was no evidence that A.A. feared for her safety when he secretly photographed and filmed her buttocks as required under K.S.A. 2019 Supp. 21-

10

5427(a)(1), and (2) because there was no evidence that he engaged in a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition. In the alternative, Loganbill suggests that K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition is unconstitutionally vague because it allows secretly photographing and filming a person's buttocks to prove stalking. Loganbill contends that if this behavior, which he describes as "facially benign," constitutes a course of conduct under K.S.A. 2019 Supp. 21-5427(f)(1), then the statute impermissibly allows the targeted person's subjective fear to control what behavior may prove stalking. Thus, Loganbill argues that we should reverse his reckless stalking conviction either because insufficient evidence supported his conviction under a proper interpretation of K.S.A. 2019 Supp. 21-5427 or because K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition is unconstitutionally vague.

The State counter argues that Loganbill's arguments are baseless. Highly summarized, it contends that Loganbill's arguments misinterpret the clear text of K.S.A. 2019 Supp. 21-5427's statutory language. The State then argues that under the correct interpretation of the statute, sufficient evidence established that Loganbill recklessly stalked A.A. As for Loganbill's constitutional vagueness argument, the State argues that we should reject Loganbill's argument because he is raising it for the first time on appeal and because it ignores our Supreme Court's contrary precedent in *State v. Whitesell*, 270 Kan. 259, 269-70, 13 P.3d 887 (2000).

A. *Multiple Standards Apply When Reviewing Loganbill's Arguments.*

The issues of statutory interpretation and constitutionality involve questions of law over which we exercise unlimited review. *State v. Harris*, 311 Kan. 816, 821, 467 P.3d 504 (2020). Likewise, "review of a trial court's denial of a motion to dismiss on a strictly legal ground [is] unlimited." *State v. Garcia*, 282 Kan. 252, 260, 144 P.3d 684 (2006). Yet, when reviewing sufficiency of the evidence challenges, we must determine whether,

after reviewing all the evidence in the light most favorable to the State, a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). While engaging in this review, we must not reweigh the evidence or resolve evidentiary conflicts. This includes reweighing the trial court's credibility determinations against the defendant on appeal. 307 Kan. at 668.

B. *A Targeted Person May Fear for His Safety, Her Safety, or a Family Member's Safety After the Accused Stalker Engaged in the Course of Conduct Proving Stalking Under K.S.A. 2019 Supp. 21-5427(a)(1).*

As he argued before the trial court, Loganbill contends that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language requires the targeted person to fear for his safety, her safety, or a family member's safety the exact moment that the accused stalker engaged in the course of conduct proving stalking. He asserts that in denying his motion to dismiss, the trial court wrongly agreed with the State's argument that his interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) was unreasonable. He maintains that the trial court misinterpreted the facts and rulings of the *Russell* and *Norman* cases to reject his suggested statutory interpretation. Loganbill further contends that an amendment to the stalking statute in 2021 supports his interpretation of K.S.A. 2019 Supp. 21-5427(a)(1).

The State counters that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language proves that A.A. did not have to fear for her safety as Loganbill engaged in the course of conduct proving stalking. It counters that in denying Loganbill's motion to dismiss, the trial court correctly relied on *Russell* and *Norman* to reject Loganbill's argument. It argues that the trial court correctly agreed with its argument that Loganbill's suggested interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) was unreasonable. Also, it argues that the 2021 amendment to the stalking statute does not support Loganbill's argument.

12

The most fundamental rule of statutory interpretation is that if our Legislature's intent is ascertainable, then our Legislature's intent controls this court's interpretation of the statute in question. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). To determine our Legislature's intent, we must first consider the disputed statute's plain language. 309 Kan. at 314. Such analysis requires us to construe the words within the disputed statute in accordance with those words' ordinary meanings. *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019). And such analysis requires us to construe the disputed statute's language reasonably. *State v. Smith*, 311 Kan. 109, 114, 456 P.3d 1004 (2020). Reasonable interpretations cannot render the plain language of the disputed statute meaningless. 311 Kan. at 114. Also, reasonable interpretations cannot read words into the disputed statute that are not readily found within its plain language. *Ayers*, 309 Kan. at 164.

If the plain language of the statute in question is clear, then we must not speculate about our Legislature's intent. 309 Kan. at 164. Rather, because our Legislature's intent is apparent in the disputed statute's plain language, we apply the disputed statute as unambiguously written. *LaPointe*, 309 Kan. at 314. Thus, the only time that we use canons of statutory construction, legislative history, or other background information to interpret the meaning of a statute is when our Legislature's intent is unclear after reviewing the statute's plain language. 309 Kan. at 314-15.

Here, Loganbill was convicted of violating K.S.A. 2019 Supp. 21-5427(a)(1). It criminalizes the following behavior:

> "*Recklessly engaging in a course of conduct targeted at a specific person* <u>which would cause a reasonable person in the circumstances of the targeted person to fear for such person's safety, or the safety of a member of such person's immediate family</u> *and the targeted person is actually placed in such fear*." (Emphasis added.) K.S.A. 2019 Supp. 21-5427(a)(1).

Thus, K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language requires the State to prove three elements: (1) that the accused stalker recklessly engaged in a course of conduct targeted at a specific person; (2) that a reasonable person in the targeted person's circumstances would fear for his safety, her safety, or a family member's safety based on the accused stalker's course of conduct; and (3) that the targeted person was "actually placed" in fear for his safety, her safety, or a family member's safety based on the accused stalker's course of conduct. In turn, there are three elements that we must consider when analyzing whether the plain statutory language of K.S.A. 2019 Supp. 21-5427(a)(1) requires the targeted person to fear for his safety, her safety, or a family member's safety the exact moment that the accused stalker engages in the course of conduct proving stalking.

The first element of the reckless stalking statute addressing the accused stalker's course of conduct does not include language about when a targeted person must fear for his safety, her safety, or a family member's safety. Also, K.S.A. 2019 Supp. 21-5427(f)(1)'s definition of the term course of conduct does not include language on when *the targeted person* must experience this fear. The only language explicitly involving time under K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition addresses when *the accused stalker* may commit acts constituting a course of conduct proving stalking. This part of K.S.A. 2019 Supp. 21-5427(f)(1) states that that the term "'[c]ourse of conduct' means two or more acts over a period of time, however short, which evidence a continuity of purpose."

Still, K.S.A. 2019 Supp. 21-5427(f)(2), which defines a communication that may constitute a course of conduct proving stalking, provides that a communication sent by regular mail or electronically "via a computer" may constitute a course of conduct proving stalking. Significantly, under K.S.A. 2019 Supp. 21-5427(f)(2)'s plain statutory language, the communication constituting the stalking course of conduct happens when

14

the accused stalker "impart[s]" the message through regular mail or electronically on a computer. K.S.A. 2019 Supp. 21-5427(f)(2).

Plainly, when an accused stalker imparts a communication to a targeted person through regular mail or electronically on a computer, the accused relies on either a real-world or an internet messenger service to transmit the communication to the targeted person. But by relying on a messenger service to transmit the communication to the targeted person, the accused avoids being in the targeted person's physical presence when committing the course of conduct proving stalking. So, in such instances, it necessarily follows that the targeted person cannot discover the accused's communication constituting the course of conduct proving stalking until the messenger service transmits it, which is necessarily after the accused imparted the communication. So, K.S.A. 2019 Supp. 21-5427(f)(2)'s plain statutory language establishes that a targeted person may discover an accused's communication constituting a course of conduct proving stalking after the accused has fully completed this communication.

Yet, because of the preceding, it further follows that our Legislature intended to criminalize certain courses of conduct that could be discovered by the targeted person only after the accused stalker has completed those courses of conduct. Thus, if we were to construe K.S.A. 2019 Supp. 21-5427(a)(1) as requiring the targeted person to experience the requisite subjective fear for his safety, her safety, or a family member's safety contemporaneously as the accused engaged in the stalking course of conduct, we would divine an unstated statutory purpose. Then, we would render part of K.S.A. 2019 Supp 21-5427(f)(2) meaningless. Put another way, we would make a portion of K.S.A. 2019 Supp 21-5427(f)(2) have no effect. See *Smith*, 311 Kan. at 114 (holding that courts must not interpret a statute in a way that renders its plain statutory language meaningless). So, the plain statutory language of K.S.A. 2019 Supp. 21-5427(f)(2) defining the communicative acts that may constitute a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(a)(1)'s first element establishes that the targeted person

15

may fear for his safety, her safety, or a family member's safety after the accused has completed the course of conduct proving stalking.

Next, and most importantly, although the second and third elements of the reckless stalking statute both address the targeted person's concern for his safety, her safety, or a family member's safety, neither element requires the targeted person to experience this fear the exact moment that the accused has completed the stalking course of conduct. The second element of K.S.A. 2019 Supp. 21-5427(a)(1) just requires the accused's stalking course of conduct to be reasonably fear-producing under "the circumstances of the targeted person." In other words, the second element of K.S.A. 2019 Supp. 21-5427(a)(1) just requires the targeted person's fear for his safety, her safety, or a family member's safety to be objectively reasonable based on the accused's course of conduct. On the other hand, the third element of K.S.A. 2019 Supp. 21-5427(a)(1) simply requires the accused's course of conduct to have "actually placed" the targeted person in fear for his safety, her safety, or a family member's safety. In other words, the third element of K.S.A. 2019 Supp. 21-5427(a)(1) simply requires the targeted person to subjectively fear the accused's stalking course of conduct.

As a result, the second and third elements of K.S.A. 2019 Supp. 21-5427(a)(1) require the targeted person to have a *subjective fear* of the disputed stalking course of conduct and an *objectively reasonable fear* of the disputed stalking course of conduct, respectively. Nevertheless, because neither element states when the targeted person must experience such fear, the plain statutory language of K.S.A. 2019 Supp. 21-5427(a)(1) does not require the targeted person to experience this fear the exact moment that the accused is engaging in the course of conduct proving stalking. To interpret the second and third elements of K.S.A. 2019 Supp. 21-5427(a)(1) otherwise would violate our rule against adding language into a statute that is not readily found therein. *Ayers*, 309 Kan. at 164.

16

Thus, to summarize, the plain statutory language of K.S.A. 2019 Supp. 21-5427(a)(1)'s three elements establishes the following: (1) that it criminalizes stalking courses of conduct discovered by the targeted person after the accused has fully completed the stalking course of conduct, and (2) that it contains no express language requiring the targeted person to fear for his safety, her safety, or a family member's safety as the accused engages in the stalking course of conduct. Hence, contrary to Loganbill's arguments, K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language does not require the targeted person to fear for his safety, her safety, or a family member's safety at the exact moment that the accused engages in the course of conduct proving stalking. So, the trial court correctly ruled that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language did not require A.A. to fear for her safety as Loganbill secretly photographed and filmed her buttocks repeatedly between August 2019 and March 2020.

Although the plain statutory language of K.S.A. 2019 Supp. 21-5427(a)(1) wholly undermines Loganbill's suggested statutory interpretation, we nonetheless point out that Loganbill never analyzed K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language to support his argument. In his brief, Loganbill's arguments take issue with how the State convinced the trial court that his interpretation was unreasonable, the caselaw that the trial court relied on to reject his argument, and later legislation inspired by his conduct in this case. In making these specific arguments, although Loganbill briefly addresses K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition, he never analyzes the clear text of K.S.A. 2019 Supp. 21-5427(a)(1)'s statutory language. As a result, Loganbill's analysis disregards the most fundamental rule of statutory interpretation; he speculates about our Legislature's intent when enacting K.S.A. 2019 Supp. 21-5427(a)(1) based on outside information when our Legislature's intent is ascertainable from the clear text of K.S.A. 2019 Supp. 21-5427(a)(1). Thus, he does violence to the basic canons of statutory interpretation. See *LaPointe*, 309 Kan. at 314; *Ayers*, 309 Kan. at 164. And because Loganbill raises a statutory interpretation argument in which he never actually analyzes K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language, his argument is

17

inadequately briefed. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (holding that an issue that is inadequately briefed is deemed waived and abandoned).

Notwithstanding the preceding, it is important to explain why Loganbill's specific arguments challenging the trial court's reasoning are unpersuasive. For starters, Loganbill's assertion that the trial court wrongly agreed with the State's unreasonableness argument is illogical. Again, when contesting Loganbill's motion to dismiss, the State argued that Loganbill's interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) was unreasonable because it allowed someone accused of repeatedly hiding outside the targeted person's house at night to avoid criminal prosecution just because the targeted person did not learn of the accused's conduct until later reviewing home-surveillance video. In denying his motion to dismiss, the trial court agreed with the State's reasoning, relying on the State's hypothetical to rule that Loganbill's suggested interpretation was unreasonable.

On appeal, Loganbill argues that this was error because "[t]his course of conduct, as contrasted with allegations against [him], clearly violated . . . K.S.A. [2019] Supp. 21-5427(f)(1)(C)." As considered in greater detail in our analysis below, K.S.A. 2019 Supp. 21-5427(f)(1)(C) is just one example in the nonexclusive list of examples of conduct that may prove stalking under (f)(1)'s course of conduct definition. Subsection (f)(1)(C) states that appearing outside a targeted person's house may constitute a course of conduct proving stalking. So, although his argument is not entirely clear, Loganbill seemingly believes that because covertly photographing and filming the targeted person is not expressly listed as a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1)(A)-(G)'s nonexclusive list of possible courses of conduct, a targeted person must experience fear as the accused completes the course of conduct proving stalking. But clearly, this argument is a non sequitur. It is an argument in which, on the face of it, there is no connection between the claim and the evidence. Here, the question if Loganbill's disputed behavior is expressly listed under K.S.A. 2019 Supp. 21-

18

5427(f)(1)(A)-(G)'s nonexclusive list of possible courses of conduct proving stalking has nothing to do with whether K.S.A. 2019 Supp. 21-5427(a)(1) requires a targeted person to fear for his safety, her safety, or a family member's safety as the accused engages in the course of conduct proving stalking. Loganbill's argument would be an instance of what is called the fallacy of irrelevance.

As for Loganbill's arguments that the trial court relied on the wrong caselaw when denying his motion to dismiss, Loganbill's arguments hinge on misinterpreting caselaw. Once more, when it denied Loganbill's motion to dismiss, the trial court relied on the *Russell* and *Norman* decisions as persuasive authority why a targeted person may fear for his safety, her safety, or a family member's safety under K.S.A. 2019 Supp. 21-5427(a)(1) after the accused completed the course of conduct proving stalking. For both the *Russell* and *Norman* cases, the trial court explained that it relied on the cases for two reasons: (1) because the stalking statutes at issue in those cases had fear elements that were similar to K.S.A. 2019 Supp. 21-5427(a)(1)'s fear elements, and (2) because the facts of those cases indicated that the targeted person need not fear for his safety, her safety, or a family member's safety as the accused engaged in the course of conduct proving stalking. Now, Loganbill argues that the trial court's reliance on *Russell* was wrong because there, the Connecticut Appellate Court never ruled that the targeted person's fear "does not need to be contemporaneous" with the accused's stalking course of conduct. Similarly, Loganbill argues that the trial court's reliance on *Norman* was wrong because there, the California Second District Court of Appeal never concluded that targeted people need "not fear for their safety when they learn of the conduct and then develop it as they learn more information."

In challenging the trial court's reliance on the *Russell* decision, Loganbill never contests the trial court's finding that Connecticut's reckless stalking statute—Conn. Gen. Stat. § 53a-181e—is like K.S.A. 2019 Supp. 21-5427(a)(1) because it has elements requiring the victim to subjectively experience fear that was also objectively reasonable

19

under the circumstances. In any case, like K.S.A. 2019 Supp. 21-5427(a)(1), Connecticut's reckless stalking statute has an objectively reasonable fear element and a subjective fear element containing no express language as to when such fear must occur. *Russell*, 101 Conn. App. at 313. Given these similarities to K.S.A. 2019 Supp. 21-5427(a)(1), Connecticut caselaw analyzing its reckless stalking statute serves as persuasive authority when analyzing K.S.A. 2019 Supp. 21-5427(a)(1).

As for the trial court's reliance on *Russell*'s underlying facts, Russell never argued that the person he targeted needed to fear for her safety the exact moments he hid outside her house. Rather, Russell argued that there was insufficient evidence that the targeted person feared for her safety since she told law enforcement that she was not afraid of Russell's behavior before she learned that Russell had repeatedly hid outside her house at night. 101 Conn. App. at 320. Even so, the Connecticut Appellate Court affirmed Russell's reckless stalking conviction because it concluded that Russell's argument "[chose] to focus on the victim's stated mindset within a narrow time frame, specifically, after she found out the dark figure was the defendant, but before she learned the full extent of his activities." 101 Conn. App. at 320. Because "unequivocal evidence" proved that the targeted person was reasonably afraid of Russell's conduct "outside of that particular time frame," the appellate court found that sufficient evidence established that the targeted person experienced a subjective fear for her safety. 101 Conn. App. at 320-21. In reaching this holding, the appellate court noted that following the targeted person's initial statement to law enforcement, she installed light sensors around her home, which evidenced her ultimate subjective fear for her safety. 101 Conn. App. at 320.

Thus, in *Russell*, the Connecticut Appellate Court ruled that sufficient evidence established that the targeted person feared for her safety based on evidence that she feared for her safety after the accused completed his stalking behavior. Because the objectively reasonable and subjective fear elements in the Connecticut reckless stalking statute are similar to K.S.A. 2019 Supp. 21-5427(a)(1)'s fear elements, the *Russell* court's

20

reliance on the targeted person's fear after the accused completed the stalking course of conduct is persuasive authority that a targeted person under K.S.A. 2019 Supp. 21-5427(a)(1) may fear for his safety, her safety, or a family member's safety after the accused engages in the course of conduct proving stalking. Consequently, contrary to Loganbill's argument, the trial court's reliance on *Russell* was not error because the *Russell* court never ruled that the targeted person's fear "need not be contemporaneous" with the accused's stalking course of conduct. Put simply, Loganbill's argument ignores the *Russell* court's sufficient evidence finding. As a result, although the trial court should have rejected Loganbill's argument based on K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language, the *Russell* decision supports that a targeted person under K.S.A. 2019 Supp. 21-5427(a)(1) may fear for his safety, her safety, or a family member's safety after the accused engages in the course of conduct proving stalking.

Turning to the *Norman* decision, we note that Loganbill never contests the trial court's finding that the California stalking statute—Cal. Pen. Code. § 646.9—is similar to K.S.A. 2019 Supp. 21-5427(a)(1) because it has elements requiring the targeted person to subjectively experience fear that was also objectively reasonable under the circumstances while lacking a "temporal modifier." Regardless, the California stalking statute in *Norman* simply required the accused's "course of conduct" to "'*be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person.*'" 75 Cal. App. 4th at 1238. Nothing in the statute specifically stated when the targeted person must subjectively fear "for his or her safety, or the safety of his or her immediate family . . . ." 75 Cal. App. 4th at 1238-39 (citing Cal. Pen. Code. § 646.9). Given these similarities to K.S.A. 2019 Supp. 21-5427(a)(1), California caselaw regarding its stalking statute serves as persuasive authority when analyzing K.S.A. 2019 Supp. 21-5427(a)(1).

Additionally, in *Norman*, the California Second District Court of Appeal ruled that because "there [was] nothing in the language of the statute [requiring] a concurrence of

21

act and reaction," the targeted person may fear for his safety, her safety, or a family member's safety after the accused had completed the course of conduct proving stalking. 75 Cal. App. 4th at 1239-40. It determined that Norman's suggested interpretation ignored that electronic communications, which "necessarily encompass[ed] situations where there [was] a delay between the defendant's harassment and his [or her] victim's awareness of the defendant's conduct," could constitute a course of conduct proving stalking under the statute. 75 Cal. App. 4th at 1239-40. Afterwards, it affirmed Norman's stalking conviction because the person he targeted—director Steven Spielberg— ultimately feared for his safety and his family's safety after learning about Norman's ongoing efforts to enter his house and rape him. 75 Cal. App. 4th at 1237-38, 1240.

So, in *Norman*, the California Second District Court of Appeal rejected Norman's argument that Spielberg had to fear for his safety and his family members' safety as Norman completed the stalking course of conduct because California's stalking statute contained no such requirement. Then, the objectively reasonable and subjective fear elements of California's stalking statute are comparable to K.S.A. 2019 Supp. 21-5427(a)(1)'s objectively reasonable and subjective fear elements. So, the *Norman* court's holding that a targeted person may experience fear for his safety, her safety, or a family member's safety after the accused completes the stalking course of conduct is persuasive authority for this: that a targeted person under K.S.A. 2019 Supp. 21-5427(a)(1) may experience such fear after the accused completes the stalking course of conduct. Loganbill's sole argument—that the *Norman* court never concluded that the targeted people need "not fear for their safety when they learn of the conduct and then develop it as they learn more information"—completely ignores the *Norman* court's explicit holding that the targeted person does not have to fear for his safety, her safety, or a family member's safety "contemporaneous[ly] with the course of conduct that constitutes the stalking." 75 Cal. App. 4th at 1241. Therefore, although the trial court should have rejected Loganbill's argument based on K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory text, the *Norman* decision supports that a targeted person under K.S.A. 2019 Supp. 21-

22

5427(a)(1) may fear for his safety, her safety, or a family member's safety after the accused completes the course of conduct proving stalking.

At this juncture, we point out that although neither the trial court nor the parties have cited to *State v. Kendall*, 300 Kan. 515, 522, 331 P.3d 763 (2014), for this purpose, our Supreme Court's analysis of K.S.A. 2010 Supp. 21-3438(a)(3)—Kansas' predecessor stalking statute—undermines Loganbill's argument. Of note, although Loganbill cites this court's *Kendall* decision, he does not cite our Supreme Court's *Kendall* decision, which reversed the portion of this court's *Kendall* decision that Loganbill relies on.

K.S.A. 2010 Supp. 21-3438(a)(3) mirrors K.S.A. 2019 Supp. 21-5427(a)(3). Like K.S.A. 2019 Supp. 21-5427(a)(1), both K.S.A. 2010 Supp. 21-3438(a)(3) and K.S.A. 2019 Supp. 21-5427(a)(3) require the targeted person to subjectively fear the accused stalker's behavior constituting the course of conduct proving stalking:

> "[A]fter being served with, or otherwise provided notice of, any protective order . . . that prohibits contact with a targeted person, intentionally or recklessly engaging in at least one act listed in subsection (f)(1) that violates the provisions of the order and *would cause a reasonable person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear*." (Emphasis added.) K.S.A. 2010 Supp. 21-3438(a)(3).

When analyzing K.S.A. 2010 Supp. 21-3438(a)(3)'s fear elements, our Supreme Court determined that an attempted communication could not be a stalking course of conduct because the targeted person must ultimately experience a subjective fear for his safety, her safety, or a family member's safety. *Kendall*, 300 Kan. at 522. It "conclude[d] that the phrase 'act of communication' as used in the stalking statute requires evidence that a perpetrator transmitted a communication to a victim." 300 Kan. at 522.

23

Then, in rejecting Kendall's argument that insufficient evidence proved that he engaged in a communication constituting a course of conduct under K.S.A. 2010 Supp. 21-3438(f)(1), it suggested that the targeted person had a sufficient subjective fear of Kendall's conduct upon learning that Kendall had called her multiple times while in prison for crimes that he committed against her. It explained that given this history of abuse, there was sufficient evidence that Kendall completed a stalking course of conduct by calling the targeted person. 300 Kan. at 526. And in reaching this determination, it noted that sufficient evidence supported Kendall's conviction because the targeted person ultimately feared for her safety after realizing that Kendall was the person who kept calling her and then hanging up before saying anything. 300 Kan. at 526.

So, our Supreme Court's analysis of K.S.A. 2010 Supp. 21-3438(a)(3)'s fear elements as well as its reliance on the targeted person's ultimate fear for her safety upon realizing that Kendall made the phone calls in question supports that there is no requirement under K.S.A. 2019 Supp. 21-5427(a)(1) that the targeted person fear for his safety, her safety, or a family member's safety as the accused engages in the course of conduct proving stalking. If our Supreme Court agreed with Loganbill's suggested interpretation of K.S.A. 2019 Supp. 21-5427(a)(1), it would not have stressed how the targeted person ultimately feared for her safety upon realizing that it was Kendall who had been calling her and hanging up. Thus, although the *Kendall* court never explicitly held that the targeted person may fear for his safety, her safety, or a family member's safety after the accused completed the stalking course of conduct, its analysis supports that it would agree with this proposition. As a result, our Supreme Court precedent does not support Loganbill's interpretation of K.S.A. 2019 Supp. 21-5427(a)(1).

As for Loganbill's remaining argument about the legislation he has inspired, he contends that our Legislature's 2021 amendment to Kansas' stalking statute "recognize[d] the legitimacy of [his] assertions." Likewise, he suggests that the Johnson County District Attorney's comments to our Legislature in support of this amendment recognized the

24

legitimacy of his assertions. But plainly, Loganbill's argument is flawed because it looks to legislative history regarding a subsection of the stalking statute that was not in effect when he committed his crime of conviction against A.A. See *State v. Coleman*, 311 Kan. 332, 337, 460 P.3d 828 (2020) (explaining that the statute in effect when the defendant committed the crime of conviction controls what law applies to the defendant).

Also, despite these issues, Loganbill's contentions are baseless. When our Legislature amended the stalking statute in 2021, it amended it so intentionally engaging in a stalking course of conduct at a specific child under age 14 in a way that makes the targeted child reasonably fear for his safety, her safety, or a family member's safety is a crime constituting a severity level 7 person felony upon someone's first offense and a severity level 4 person felony upon someone's second offense. L. 2021, ch. 48, § 1; K.S.A. 2021 Supp. 21-5427(b)(4)(A)-(B). Outside of the preceding amendment, though, our Legislature did not amend K.S.A. 21-5427. So, in 2021, our Legislature created a new stalking crime with a more severe penalty upon its first offense than the penalty for first-time reckless stalking offenders. It did not add any language recognizing the legitimacy of Loganbill's argument that K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language required the targeted person to fear for his safety, her safety, or a family member's safety as the accused engages in the course of conduct proving stalking. Hence, the 2021 amendment to the stalking statute does not support Loganbill's interpretation of K.S.A. 2019 Supp. 21-5427(a)(1).

     C. *Secretly Photographing and Filming a Targeted Person Repeatedly May Constitute a Course of Conduct Proving Stalking Under K.S.A. 2019 Supp. 21-5427(f)(1).*

On appeal, although he never made the specific argument before the trial court, Loganbill complains that he could not have stalked A.A. by secretly photographing and filming her buttocks repeatedly. According to Loganbill, a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1) involves the accused stalker engaging in

25

some overtly threatening and intrusive behavior that conveys a shared message to the targeted person. In making this argument, Loganbill relies on this court's decision in *State v. Kendall*, No. 106,960, 2013 WL 4404174, at *3 (Kan. App. 2013) (unpublished opinion), *aff'd in part, rev'd in part* 300 Kan. 515, 331 P.3d 763 (2014). This court's *Kendall* decision held that the accused stalker and the targeted person must "share comprehension of the communicative format of the idea" for the accused's communication to constitute a course of conduct proving stalking. 2013 WL 4404174, at *3. On the other hand, in suggesting that there is insufficient evidence that he engaged in a stalking course of conduct unless his motive for photographing and filming A.A.'s buttocks is considered, Loganbill argues that under K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition, it is "statutorily irrelevant" why the accused stalker's course of conduct was targeted at a specific person. To support this argument, he cites our Supreme Court's *Whitesell* decision for the proposition that "the purpose of the stalking statute is to protect innocent citizens from threatening conduct, *irrespective of motive*, that subjects them to a reasonable fear of physical harm."

The State counters by arguing that Loganbill's argument ignores K.S.A. 2019 Supp. 21-5427(f)(1)'s plain statutory language. It contends that secretly photographing and filming A.A.'s buttocks repeatedly was consistent with the nonexclusive list of acts constituting courses of conduct proving stalking under K.S.A. 2019 Supp. 21-5421(f)(1)(A)-(G). Additionally, the State argues that despite Loganbill's argument that his motive was irrelevant, the evidence regarding why he was photographing and filming A.A.'s buttocks repeatedly was relevant to establishing why A.A. reasonably feared Loganbill's course of conduct.

Of note, the State never contends that Loganbill's argument is not properly before us. Still, because Loganbill never explicitly argued that photographing and filming A.A. was not a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1) below, we point out that Loganbill's ultimate complaint involves the sufficiency of the

26

evidence against him. Loganbill argues that under a proper interpretation and application of K.S.A. 2019 Supp. 21-5427(f)(1), the trial court could not find that secretly photographing and filming A.A.'s buttocks repeatedly was a course of conduct proving stalking. Our Supreme Court has recognized that a criminal defendant is not required to contest a sufficiency of evidence claim to preserve it for appeal: "There is no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve the question for appeal." *State v. Farmer*, 285 Kan. 541, Syl. ¶ 1, 175 P.3d 221 (2008). Also, at least in the context of alternative means arguments involving statutory interpretation, our Supreme Court has held that such statutory interpretation arguments may be raised for the first time on appeal because they implicate whether sufficient evidence supports the appellant's conviction. See *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014). Thus, although Loganbill never argued that his behavior was not a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1) below, we will consider Loganbill's argument because it ultimately concerns whether there is sufficient evidence supporting his conviction under a proper interpretation of K.S.A. 2019 Supp. 21-5427(a)(1), (f)(1), and (f)(2).

To review, K.S.A. 2019 Supp. 21-5427(a)(1) criminalizes the following:

"*Recklessly engaging in a course of conduct targeted at a specific person which would cause a reasonable person in the circumstances of the targeted person to fear for such person's safety, or the safety of a member of such person's immediate family* and the targeted person is actually placed in such fear." (Emphasis added.)

Subsection (f)(1) defines the term "course of conduct." It provides as follows:

"(1) 'Course of conduct' means *two or more acts over a period of time, however short, which evidence a continuity of purpose*. A course of conduct shall not include constitutionally protected activity *nor conduct that was necessary to accomplish a legitimate purpose independent of making contact with the targeted person. A course of*

27

*conduct shall include, but not be limited to, any of the following acts or a combination thereof*:

(A) *Threatening the safety of the targeted person* or a member of such person's immediate family;

(B) *following, approaching or confronting the targeted person* or a member of such person's immediate family;

(C) *appearing in close proximity to, or entering the targeted person's* residence, place of employment, *school* or other place where such person can be found, or the residence, place of employment or school of a member of such person's immediate family;

(D) causing damage to the targeted person's residence or property or that of a member of such person's immediate family;

(E) placing an object on the targeted person's property or the property of a member of such person's immediate family, either directly or through a third person;

(F) causing injury to the targeted person's pet or a pet belonging to a member of such person's immediate family;

(G) *any act of communication*." (Emphases added.) K.S.A. 2019 Supp. 21-5427(f)(1).

Meanwhile, subsection (f)(2) further defines the term "communication." It states:

"'[C]ommunication' means *to impart a message by any method of transmission*, *including, but not limited to*: Telephoning, personally delivering, sending or having delivered, any information or material by written or printed note or letter, package, mail, courier service or electronic transmission, including electronic transmissions generated or communicated via a computer." K.S.A. 2019 Supp. 21-5427(f)(2).

Thus, to commit reckless stalking in violation of K.S.A. 2019 Supp. 21-5427(a)(1), the accused must recklessly engage in a course of conduct as defined under K.S.A. 2019 Supp. 21-5427(f)(1). Nevertheless, to qualify as a course of conduct under subsection (f)(1)'s plain statutory language, the disputed behavior constituting the course of conduct must involve at least two acts that show "a continuity of purpose."

28

Although the term "continuity of purpose" is not expressly defined under the stalking statute, it is readily apparent what our Legislature meant by using the term "continuity of purpose." The purpose of K.S.A. 2019 Supp. 21-5427 is to criminalize stalking. K.S.A. 2019 Supp. 21-5427(a)(1)-(3) prohibits knowing or reckless behavior that reasonably causes the targeted person to fear for his safety, her safety, or a family member's safety. See *Whitesell*, 270 Kan. 259, Syl. ¶ 9 (explaining that the purpose of the stalking statute is to criminalize "recurring intimidation, fear-provoking conduct, and physical violence"). So, when our Legislature required the accused stalker's course of conduct to show a continuity of purpose, it follows that our Legislature intended for the accused stalker's course of conduct to show his or her continuity of purpose to engage in acts that would reasonably cause the targeted person to fear for his safety, her safety, or a family member's safety. *As a result, the key question when deciding whether the accused stalker's behavior constituted a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1) is whether the accused's behavior evidenced his or her continuity of purpose to target the person in a way that would reasonably cause the targeted person to fear for his safety, her safety, or a family member's safety. So, in deciding whether the accused's behavior constituted a stalking course of conduct, a fact-finder must consider whether the targeted person's fear was objectively reasonable.*

Here, A.A.'s fear was objectively reasonable because the evidence showed that Loganbill had a designed plan to secretly photograph and film A.A.'s buttocks over an extended period during her school year in a way that reasonably caused A.A. to fear for her safety. But Loganbill never truly engages in any analysis addressing whether covertly photographing and filming A.A.'s buttocks numerous times evidenced his continuity of purpose to engage in acts that would reasonably cause A.A. to fear for her safety under K.S.A. 2019 Supp. 21-5427(f)(1)'s plain statutory language. Indeed, just like his earlier statutory interpretation argument, Loganbill's current statutory interpterion argument is flawed for several reasons.

To begin with, Loganbill's analysis wrongly focuses on why secretly photographing and filming A.A.'s buttocks was not a communication constituting a course of conduct under K.S.A. 2019 Supp. 21-5427(f)(1)(G). He never explains why secretly photographing and filming A.A. could not be considered evidence of his continuity of purpose to target A.A. in a way that would reasonably cause A.A. to fear for her safety under K.S.A. 2019 Supp. 21-5427(f)(1) generally or (f)(1)(A)-(F). In fact, he never recognizes that K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition requires the accused stalker's course of conduct to show a continuity of purpose. His analysis never even mentions the term "continuity of purpose."

Yet, as just outlined, K.S.A. 2019 Supp. 21-5427(f)(1)(A)-(G) is a nonexclusive list describing acts that may constitute a course of conduct proving stalking. So, Loganbill's argument why secretly photographing and filming A.A.'s buttocks repeatedly was not a communication constituting a course of conduct under K.S.A. 2019 Supp. 21-5427(f)(1)(G) does not, in and of itself, establish that secretly photographing and filming A.A.'s buttocks repeatedly was not a course of conduct under K.S.A. 2019 Supp. 21-5427(f)(1). In turn, by failing to discuss why secretly photographing and filming A.A.'s buttocks repeatedly did not constitute a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1)(A)-(F), Loganbill failed to fully analyze K.S.A. 2019 Supp. 21-5427(f)(1)'s plain statutory language. In other words, Loganbill has inadequately briefed and thus abandoned his argument because he analyzes a single subsection of K.S.A. 2019 Supp. 21-5427(f)(1)'s nonexclusive list of acts that may constitute a course of conduct proving stalking without actually analyzing whether his behavior constituted a course of conduct proving stalking under K.S.A. 2019 Supp. 21-5427(f)(1) generally. See *Salary*, 309 Kan. at 481.

Next, even though Loganbill has not adequately briefed this argument, Loganbill's arguments are not supported by K.S.A. 2019 Supp. 21-5427(a)(1)'s plain statutory language, subsection (f)(1)'s plain statutory language, or our Supreme Court's *Kendall*

30

decision. Loganbill seemingly believes that because his disputed behavior appeared "facially benign," his behavior was not a course of conduct as meant under K.S.A. 2019 Supp. 21-5427(f)(1). But even if we were to assume for argument's sake that Loganbill's disputed behavior seemed facially benign, nothing under K.S.A. 2019 Supp. 21-5427(a)(1)'s or (f)(1)'s plain statutory language supports Loganbill's contention that the accused stalker's course of conduct must be overtly threatening and intrusive. The course of conduct element simply requires the accused stalker's course of conduct to evidence a continuity of purpose to target a person in a way that would reasonably cause the targeted person to fear for his safety, her safety, or a family member's safety. So, K.S.A. 2019 Supp. 21-5427(f)(1)'s plain statutory language contradicts Loganbill's argument.

Also, as already explained, in *Kendall*, our Supreme Court affirmed Kendall's stalking conviction based on his acts of calling the targeted person and hanging up before saying anything to the targeted person. 300 Kan. at 525-26. So, in *Kendall*, our Supreme Court determined that silent communications may constitute a course of conduct proving stalking. If the accused may complete a course of conduct proving stalking by transmitting silent communications to the targeted person, it follows that a course of conduct proving stalking need not be overtly threatening and intrusive. Thus, our Supreme Court's precedent in *Kendall* does not support Loganbill's suggested interpretation of K.S.A. 2019 Supp. 21-5427(a)(1)'s course of conduct definition. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017) (holding that this court is duty-bound to follow our Supreme Court's precedent absent some evidence that our Supreme Court is moving away from that precedent).

As for Loganbill's argument that it is "statutorily irrelevant" why the accused stalker's course of conduct was targeted at a specific person, subsection (f)(1)'s plain statutory language requires a fact-finder to consider the accused's purpose for engaging in the disputed behavior because K.S.A. 2019 Supp. 21-5427(f)(1) defines "course of conduct" as acts that "evidence a continuity of *purpose*." (Emphasis added.) In other

31

words, under K.S.A. 2019 Supp. 21-5427(f)(1)'s course of conduct definition, the fact-finder must decide whether the accused stalker's disputed behavior evidenced the accused's continuity of purpose to target the person in a way that would reasonably cause the targeted person to fear for his safety, her safety, or a family member's safety. By contrast, Loganbill asserts that K.S.A. 2019 Supp. 21-5427(f)(1) prohibited the trial court from considering his motives for photographing and filming A.A. repeatedly. Under K.S.A. 2019 Supp. 21-5427(f)(1)'s plain statutory language, the trial court had to consider whether Loganbill's designed behavior of photographing and filming her buttocks evidenced his continuity of purpose to target A.A. in a way that would reasonably cause A.A. to fear for her safety.

Lastly, we note that Loganbill's specific arguments are devoid of any recitation of proper authority why secretly photographing and filming A.A. were not communications constituting a course of conduct under K.S.A. 2019 Supp. 21-5427(f)(1)(G).

In this court's *Kendall* decision, when interpreting the term "communication" under K.S.A. 2010 Supp. 21-3438(f)(1)(G), we concluded that "[t]he notion of imparting or sending a message presumes the sender and recipient share comprehension of the communicative format of the idea. And it presupposes an underlying idea." 2013 WL 4404174, at *3. Relying on this language, Loganbill argues that secretly photographing and filming A.A. repeatedly were not communications under K.S.A. 2019 Supp. 21-5427(f)(1)(G) because he "made efforts to keep [A.A.] unaware of the photos" and films. Loganbill seemingly believes that because he attempted to hide his behavior, he and A.A. could not have shared comprehension of the communicative format or idea.

Yet again, when our Supreme Court reviewed Kendall's appeal, it determined that "the phrase 'act of communication' . . . requires evidence that a perpetrator transmitted a communication to a victim" before affirming Kendall's conviction based on evidence that the targeted person subjectively feared for her safety after Kendall completed the

disputed communications. *Kendall*, 300 Kan. at 522. It never approved of this court's ruling that a communication constituting a course of conduct proving stalking requires the accused stalker and the targeted person to share comprehension of the communicative format or idea. 300 Kan. at 526. As a result, in *Kendall*, our Supreme Court, if not explicitly, implicitly rejected this court's ruling that the accused stalker and the targeted person must "share comprehension" of the communication constituting the course of conduct proving stalking. Thus, Loganbill's suggested interpretation of K.S.A. 2019 Supp. 21-5427(f)(1)(G) hinges on a holding in this court's *Kendall* decision that our Supreme Court did not approve in its *Kendall* decision.

Loganbill's reliance on *Whitesell* is similarly flawed. Loganbill contends that in *Whitesell*, our Supreme Court held that "the purpose of the stalking statute is to protect innocent citizens from threatening conduct, *irrespective of motive*, that subjects them to a reasonable fear of physical harm." But the *Whitesell* court never held that motive was irrelevant when deciding whether the accused's acts constituted a course of conduct proving stalking. Whether the trial court could consider Whitesell's motive when analyzing the course of conduct element of the stalking statute was not an issue in Whitesell's case. In actuality, the portion of the *Whitesell* decision that Loganbill cites explains why the stalking statute is not unconstitutionally overbroad. See 270 Kan. at 272. So, Loganbill's reliance on *Whitesell* is wholly unpersuasive.

To conclude, although Loganbill argues that K.S.A. 2019 Supp. 21-5427(f)(1) requires the accused stalker's course of conduct to involve overtly threatening and intrusive behavior that conveys a shared message to the targeted person, K.S.A. 2019 Supp. 21-5427(a)(1)'s and (f)(1)'s plain statutory language do not support Loganbill's interpretation. Loganbill's arguments supporting his interpretation of K.S.A. 2019 Supp. 21-5427(f)(1) do not actually analyze K.S.A. 2019 Supp. 21-5427(f)(1)'s plain statutory language. Rather, his arguments rely on overturned caselaw in this court's *Kendall*

decision and rely on an errant explanation of our Supreme Court's *Whitesell* decision. Thus, we reject Loganbill's requested interpretation of K.S.A. 2019 Supp. 21-5427(f)(1).

D. *K.S.A. 2019 Supp. 21-5427 Does Not Allow Subjective Determinations to Control What Constitutes a Course of Conduct Proving Stalking.*

In his alternative argument, Loganbill asserts that K.S.A. 2019 Supp. 21-5427 is unconstitutionally vague because it allows a targeted person's subjective fear to control what constitutes a course of conduct proving stalking. Nevertheless, there are several obvious problems with this argument.

As argued by the State, Loganbill is making this argument for the first time on appeal without ever acknowledging that he is raising this argument for the first time on appeal. Because Loganbill raises his constitutional vagueness argument for the first time on appeal, it is not properly before us. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (holding that constitutional arguments are not properly preserved when raised for the first time on appeal); *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015) (holding that appellants who do not explain why they raised an argument for the first time on appeal risk improperly briefing and thus abandoning that new argument because they have violated Supreme Court Rule 6.02(a)(5) [2022 Kan. S. Ct. R. at 35] requiring such explanation).

Also, as argued by the State, even if we were to ignore that Loganbill has improperly raised this argument for the first time on appeal, it points out that Loganbill has never addressed our Supreme Court's holding in *Whitesell* that the stalking statute's "course of conduct" definition was not unconstitutionally vague. See 270 Kan. at 270. It is a well-known rule that we are duty-bound to follow our Supreme Court's precedent absent some indication that our Supreme Court is moving away from its previous precedent. *Rodriguez*, 305 Kan. at 1144. So, to adequately brief his constitutional

vagueness argument, at the very least, Loganbill needed to explain why the *Whitesell* precedent does not apply to his constitutional vagueness argument. See *Salary*, 309 Kan. at 481 (holding that failing to show why an argument is sound in the face of contrary authority is akin to inadequately briefing the argument).

Finally, even if we were to ignore both the preceding preservation problems, Loganbill's constitutional vagueness argument hinges on his belief that K.S.A. 2019 Supp. 21-5427 contains no objective test for determining what constitutes a course of conduct proving stalking. But as explained in the previous section, under K.S.A. 2019 Supp. 21-5427(a)(1)'s and (f)(1)'s plain statutory language, a fact-finder must consider whether the accused's disputed behavior evidenced his or her continuity of purpose to target a person in a way that would reasonably cause the targeted person to fear for his safety, her safety, or a family member's safety. This means that the disputed behavior cannot constitute a course of conduct unless it would also cause an objectively reasonable person in the targeted person's position to fear for his safety, her safety, or a family member's safety. As a result, Loganbill's argument that K.S.A. 2019 Supp. 21-5427 is unconstitutionally vague because it allows a targeted person's subjective fear to control what constitutes a course of conduct proving stalking is baseless.

E. *Sufficient Evidence Supported Loganbill's Reckless Stalking Conviction Under K.S.A. 2019 Supp. 21-5427(a)(1).*

Once more, Loganbill argues that there is insufficient evidence to support his reckless stalking conviction under his suggested interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) and (f)(1). For the reasons explained previously, Loganbill's suggested interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) and (f)(1) is wrong for several reasons. Accordingly, Loganbill's argument that insufficient evidence supports his reckless stalking conviction fails because it relies on his errant interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) and (f)(1). Because Loganbill never argues that insufficient evidence

35

supported his reckless stalking conviction under a proper interpretation and application of K.S.A. 2019 Supp. 21-5427(a)(1) and (f)(1), Loganbill has abandoned any argument that insufficient evidence supported his reckless stalking conviction under the statute's proper interpretation and application. See *Salary*, 309 Kan. at 481.

All the same, it is worth mentioning that there is ample evidence to support Loganbill's reckless stalking conviction under both a proper interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) and (f)(1) as well as Loganbill's suggested improper interpretation of K.S.A. 2019 Supp. 21-5427(a)(1) and (f)(1).

Loganbill's statutory arguments emphasize the fact that A.A. believed that he was photographing and filming the classroom, not her buttocks specifically, until the final day that she was in his classroom. He refers to his disputed behavior as "facially benign." Yet, Loganbill's analysis conveniently ignores that he did not passively photograph and film A.A.'s buttocks. The evidence supports that Loganbill photographed and filmed A.A.'s buttocks after directing A.A. to answer a telephone and after directing A.A. to have a leg hold competition with her friends. Loganbill's analysis ignores that A.M. and A.J. discovered that he was photographing and filming A.A.'s buttocks without help from any adults. It ignores that after A.M. and A.J. told A.A. that they were worried about Loganbill photographing and filming her buttocks, A.A., A.M., and A.J. "test[ed]" to see if Loganbill would try to photograph and film A.A.'s buttocks when she got up to get a tissue, at which point Loganbill took out his phone and pointed it toward A.A.'s buttocks. Also, it ignores A.A.'s and K.A.'s testimony that his behavior frightened A.A. to the point that she cried, became physically sick, and feared returning to school.

So, although he argues otherwise, Loganbill's behavior was not facially benign. This is why the three fourth graders recognized his behavior as troubling. In the context of photographing the leg hold competition, the evidence supports that Loganbill approached A.A. before directing her to have the leg hold competition. See K.S.A. 2019

36

Supp. 21-5427(f)(1)(B) (stating that approaching the targeted person may constitute a course of conduct proving stalking). And more generally, Loganbill's repeated acts of secretly photographing and filming A.A.'s buttocks constituted a course of conduct under K.S.A. 2019 Supp. 21-5427(f)(1) because they evidenced Loganbill's continuity of purpose to engage in behavior that would cause a reasonable fourth grader to fear for her safety. Because A.A.'s testimony supports that she subjectively feared for her safety upon learning about Loganbill's behavior from A.M. and A.J. at recess, it follows that A.A. continued to fear for her safety throughout the remainder of the school day. This would include when A.A., A.M., and A.J. tested whether Loganbill would photograph or film A.A.'s buttocks during the experiment with the tissue. Hence, although A.A. was not statutorily required to subjectively fear for her safety contemporaneously with Loganbill engaging in the course of conduct proving stalking, the evidence supports that A.A. feared for her safety as Loganbill took one of his final photos or videos of A.A.'s buttocks.

Next, in his brief, Loganbill strongly argues that "it is highly unlikely" that A.A. ever actually feared him because if she did, she would have not participated in the above-referenced test suggested by her classmates. This test revolved around whether Loganbill would secretly photograph or film A.A.'s buttocks if he was presented with an opportunity to do so. There are obvious weaknesses in Loganbill's argument. Let us consider some of the facts about Loganbill's relationship with A.A. First, it is obvious that Loganbill knew that A.A. was only 10 years old since he was her teacher. Second, the facts illuminate how he went about grooming A.A. into becoming his teacher's pet. For example, throughout the school year, A.A., A.M., and A.J. observed Loganbill giving A.A. special treatment. They witnessed that A.A. would not get in trouble when she broke classroom rules, for instance, talking in class, while other students would get in trouble for doing the same thing. A.A. discerned that unlike other classmates, Loganbill would specifically invite her to eat lunch with him. Also, A.A. accurately perceived that

she got extra help on her schoolwork. For instance, Loganbill would allow A.A. to use a calculator on her math tests while her other classmates could not use a calculator.

Children of A.A.'s age are generally curious and less mature than their adult counterparts. Also, they are less judgmental of others. In most cases, they view everyone as a possible friend. Indeed, Justice Sonia Sotomayor of the United States Supreme Court made these observations when stating how the law has historically viewed children: "Our various statements to this effect are far from unique. The law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and process only an incomplete ability to understand the world around them." *J.D.B. v. North Carolina*, 564 U.S. 261, 273, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). Justice Sotomayor further stated: "'Our history is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults." 564 U.S. at 274 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115-16, 102 S. Ct. 869, 71 L. Ed. 2d 1 [1982]). So, when deciding whether a child targeted by someone accused of reckless stalking in violation of K.S.A. 2019 Supp. 21-5427(a)(1) objectively feared for his safety, her safety, or a family member's safety, a fact-finder must consider the child's maturity and age in its analysis.

We note a complete absence in Loganbill's appellate brief of any discussion about A.A.'s age while he was secretly photographing and filming her. As Justice Sotomayor pointed out, children are less mature and responsible than adults. Thus, they are more vulnerable or susceptible to adults who befriend them, especially teachers and coaches. They do not automatically believe the worst when presented with a new situation. As adults, we have observed events that would leave a mature adult unshaken, but those same events would overwhelm a 10-year-old child. Nevertheless, the evidence here supports that A.A. feared for her safety when she became aware of Loganbill's designed behavior after he took one of his final photos of her buttocks. Thus, Loganbill's lack of

38

fear argument rings hollow when considering A.A.'s age, immaturity, and Loganbill's successful grooming of her.

Affirmed.